IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:24-cr-34

RICHARD SCOTT TYSON,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the DEFENDANT'S SECOND RENEWED MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 102) ("the Second Renewed Motion"). For the reasons set forth below, the Motion was DENIED pursuant to the Court's Order on January 10, 2025 (ECF No. 110).

## PROCEDURAL HISTORY

On March 5, 2024, a Grand Jury sitting in the Eastern District of Virginia returned an INDICTMENT (ECF No. 1) against Defendant Richard Scott Tyson, a/k/a Richard Samuel Tyson ("Tyson" or "Defendant"), charging him with one count of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), and one count of Attempted Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b). The INDICTMENT also contained a forfeiture allegation.

On April 26, 2024, the Defendant filed a MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 18) ("First Motion to Suppress"). Three evidentiary hearings ensued. On June 11, 2024, Detective Traquan Gregory of the Goochland County Sheriff's Office, testified. COMPLETE TRANSCRIPT OF TESTIMONY OF DETECTIVE GREGORY BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 50) ("June 11 Tr."). On June 17, 2024, Detective Danny Joyner, of the Powhatan County Sheriff's Office, testified. COMPLETE TRANSCRIPT OF MOTIONS BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 62) ("June 17 Tr."). On June 24, 2024, Special Agent William Lopez and Special Agent Matthew Marasco, of the Federal Bureau of Investigation ("FBI"), testified. COMPLETE TRANSCRIPT OF MOTIONS BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 69) ("June 24 Tr.").

Having heard that testimony, the Court denied the First Motion to Suppress, with leave to re-file because the memoranda in support of, and in opposition to, the First Motion to Suppress were not tethered to the testimony presented at the evidentiary hearings. ORDER of June 25, 2024 (ECF No. 58). On June 26, 2024, a SUPERSEDING INDICTMENT (ECF No. 59) was returned against Tyson. It added one count of committing Counts I through III while being an individual required by federal or other law to register as a sex offender, in

violation of 18 U.S.C. §§ 2251 and 2422; and, two counts of Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(1).[1]

On July 31, 2024, Tyson filed the DEFENDANT'S RENEWED MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 73) ("Renewed Motion"). On August 19, 2024, the Court heard evidence on the Renewed Motion in the form of testimony from Detectives Danny Joyner and Austin Schwartz. COMPLETE TRANSCRIPT OF TESTIMONY OF DETECTIVES JOYNER AND SCHWARTZ BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 99) ("Sept. 19 Tr."). Following hearings on the Renewed Motion, the Court denied the Renewed Motion without prejudice to the filing of a Second Renewed Motion. (ECF No. 98). On October 22, 2024, Tyson filed the Second Renewed Motion. The facts surrounding the offense, and necessary to decide the Second Renewed Motion, as set forth in the SUPERSEDING INDICTMENT, the briefs, the exhibits, and the testimony produced at the hearings, are as follows.

### FACTUAL BACKGROUND

#### a. The Initial Investigation and State Search Warrants

The investigation into Tyson's conduct began when a concerned grandparent contacted law enforcement in Powhatan County about his

---

[1] The Obstruction of Justice counts are based on allegations that Tyson contacted witnesses with the intent to influence their testimony and to have them destroy evidence. ECF No. 59 at 3. The alleged behavior surrounding those counts does not impact the analysis of the Second Renewed Motion.

teenaged granddaughter, minor female ("MF"), having conversations with adult men online. RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO SUPPRESS ("Resp."), ECF No. 105, at 1-2 (citing Affidavit of Powhatan County Detective Joyner in Support of the August 22, 2023 Search Warrant ("Joyner Affidavit"), ECF No. 73-3 at 10).

The affidavit in support of the state search warrant for Tyson's home outlines in detail how the investigation commenced. ECF No. 73-3 at 10-12. MF's grandfather became aware that she had been Snapchatting[2] with several adults, including Tyson whom the grandfather knew to be a registered sex offender. Id.; June 17 Tr. at 6:18-7:2; 11:1-12. On June 13, 2023, the grandfather turned MF's phone over to law enforcement. ECF No. 73-3 at 10. On June 21, 2023, Detective Joyner of the Powhatan County Sheriff's Office interviewed MF, who reported that she had, in fact, been snapchatting with Tyson. Id. at 11. However, MF also reported that Tyson had neither sent her explicit images or sexual content, nor requested either from her. Id. at 11. Detective Joyner then

_____

[2] Snapchat is a popular messaging application primarily accessed as an application ("app") on a smartphone that that lets users exchange pictures and videos (called snaps) that are meant to disappear after they are viewed. June 17 Tr. at 11:19-23; 12:7-11. Snapchat is usually accessed and used by way of the app, but users can still use Snapchat by way of computer, without the app. June 17 Tr. at 12:7-13.

4

obtained MF's consent, and that of her mother, to run a Cellebrite[3] report on MF's phone, which law enforcement ran later that day. Id.; June 17 Tr. at 16:19-17:1; 18:1-11. The report revealed hundreds of Snapchat messages between MF and several adults, including Tyson. Id. at 11-12; June 17 Tr. at 38:7-24. The messages revealed that Tyson had arranged meetups between MF and her boyfriend. Id. The boyfriend is an alleged victim of Tyson's, Minor Victim 1 ("MV1"). Tyson offered to let MF and MV1 come swim in his hotel pool, Tyson gave MF rides home, and Tyson messaged MF, on Snapchat, late into the night on several occasions. Id. Messages between MF and MV1 also revealed that, according to MV1, Tyson offered to arrange for MF and MV1 to spend time together and encouraged MV1 to engage in sexual behavior with MF. Id. Detective Joyner testified that, based on the content of the messages between MF and Tyson, he believed Tyson was "grooming" MF. Id. at 12.

On June 30, 2023, MF was forensically interviewed at the Davis Child Advocacy Center in Chesterfield. Id. During the interview, MF did not disclose that anything sexual or sexually suggestive had happened between her and Tyson. Id.

---

[3] Cellebrite is a software used by law enforcement agencies through which they scan phones and create a detailed easily readable report of all the information contained within the data on the phone. June 17 Tr. at 18:1-22:17.

Virginia law requires convicted sex offenders to register "any instant message, chat or other Internet communication name or identity information that the person uses or intends to use." Va. Code. § 9.1-903(B). Detective Joyner checked the Virginia State Police sex offender registry and confirmed that Tyson was a registered sex offender. June 17 Tr. at 61:19-62:8. He then found a registration form signed by Tyson on July 27, 2023 (after the Snapchat messages between Tyson and MF/MV1 took place) that did not disclose the Snapchat account. Id.

On July 7, 2024, Detective Joyner interviewed Randi Lanzafama, a supervisor at the sex offender program of the Virginia Department of Corrections, who had supervisory authority over Tyson when Tyson was listed as a violent sex offender there. June 17 Tr. at 62:9-63:15. Lanzafama told Joyner that other sex offenders had reported to her that Tyson "had a boy living with him" and was taking minor boys on trips and driving them to and from school. Id. at 60:12-21; 63:16-22; 64:25-65:16.

Based on the interview with Lanzafama, the interview with MF, and taking into consideration that Tyson failed to report any Snapchat or other social media accounts, Detective Joyner obtained search warrants for Snapchat's records and for Tyson's home on August 17, 2023. June 17 Tr. at 71:4-8; 72:17-19. The first search warrant addressed to Snapchat sought the contents of Tyson's and MF's Snapchat accounts, and was signed by a Powhatan County General

6

District Court Judge.[4] ECF No. 73-2. The second search warrant for Tyson's home was signed by the same Judge, but it was not executed because the warrant contained an erroneous home address for Tyson. June 17 tr. at 74:5-16. A few days later, on August 22, 2023, Detective Joyner obtained another search warrant for Tyson's home, with the correct address, using the same supporting affidavit as the warrant that was abandoned because it listed the wrong address. See generally ECF 73-3; June 17 Tr. at 84:1-6. The corrected warrant was signed by a magistrate. Id. Both the search warrant addressed to Snapchat and the search warrant for Tyson's home read: "This SEARCH WARRANT is issued in relation to an offense substantially described as follows: § 18.2-472.1. Failure to provide registration information as required." ECF Nos. 73-2; 73-3 (emphasis added). In other words, on the face of the warrants, the only crime being investigated, and for which the warrants sought evidence was the failure to register the Snapchat account by Tyson as a registered sex offender.

   **b. The State Search Warrant for Tyson's Home: Supporting Documents**

On the warrant for Tyson's home, the description of places and items to be searched and the affidavit setting forth probable

---

[4] Tyson has lodged no objection to the search warrant addressed to Snapchat, and it is not at issue in the Second Renewed Motion.

cause were attached, respectively, as "Attachment A" and "Attachment B." ECF No. 73-3 at 5-9; ECF No. 73-3 at 10-12.

Attachment A contains five headers: "Computers and Electronic Media," "Computer and Internet Records," "Materials Relating to Child Erotica and Depictions of Minors," "Photographs of Search," and "Physical and Forensic Examination of the Seized Items." ECF No. 73-3 at 5-9. The following sections, and their descriptions, are highly relevant to the disposition of the Second Renewed Motion, so they warrant detailed attention.

"Computers and Electronic Media" is the widest encompassing section of the search warrant, describing present and deleted data on all computers, computer equipment, cell phones, tablets, external hard drives, floppy disks, peripheral devices such as keyboards and printers, recording equipment, software, codes, data and data fragments, documentation of the above, passwords, slides, microfilms, CD-ROMSs, etc.--basically any computer and electronics hardware and software whatsoever. Id. ¶¶ 1-8.

The "Computer and Internet Records" section included internet and phone records, address and identifying information records, and records of all chat apps to include stored pictures, messages, and documents. Id. ¶¶ 9-12.

The "Materials Relating to Child Erotica and Depictions of Minors" section covered any and all visual depictions of minors, names, books, and records of minors visually depicted in sexually

explicit conduct (as defined in Va. Code § 18.2-374.1, one of Virginia's child pornography statutes), all records reflecting personal contact "and any other activities" with minors visually depicted in sexually explicit conduct as defined in § 18.2-374.1, and any and all child erotica. Id. ¶¶ 13-16.

At the June 17, 2024 hearing, Detective Joyner testified that he consulted with the Deputy Commonwealth's Attorney for Powhatan County about this search warrant, and the prosecutor advised him that the "Materials Relating to Child Erotica and Depictions of Minors" section should be removed from the description of items to be seized because the alleged probable cause was likely insufficient. June 17 Tr. at 82:8-83:23. Detective Joyner testified that he forgot to remove that section, but that, at the time of the execution of the residential search warrant, he believed that it had been deleted. Id.

"Photographs of Search" and "Physical and Forensic Examination of the Seized Items" set forth that photographs would be taken on-site, and any seized items would be forensically analyzed. ECF No. 73-3 ¶¶ 17-18. That section of the application for the warrant specifically states that the forensic examination of seized items would be to look for "contraband, evidence, and instrumentalities that relate to or constitute violations of [Va. Code §§] 18.2-374.1:1 and 18:2-374.1 . . . ," Virginia's child pornography statutes. Id. ¶ 18 (emphasis added).

9

### c. Executing the State Search Warrant for Tyson's Home and the Continuing Investigation

Police executed the search warrant for Tyson's home on August 24, 2023. June 17 Tr. at 89:21-22. As Tyson was escorted out of his home, he was notified that law enforcement had a search warrant for the premises. June 17 Tr. at 90:10-16. Tyson was taken to a nearby police vehicle where he was questioned by Detective Joyner. Tyson was in the front passenger seat; Detective Joyner was in the driver's seat; and Detective Schwartz was in the back seat. June 17 Tr. at 90:17-19; September 19 Tr. at 35:2-5. Tyson was not handcuffed during questioning. Id. at 24:13-14. No law enforcement agent provided a copy of the search warrant and the affidavit to Tyson as required by Va. Code § 19.2-56(B). June 17 Tr. at 94:10-14; June 11 Tr. at 9:18-11:15.

Joyner read Tyson his Miranda rights, and Tyson waived his right to counsel and agreed to answer questions. June 17 Tr. at 184:24-185:1. During the interview, Tyson confirmed that he was a sex offender and that he was required to register his online accounts. Id. at 96:8-25. He reported that he had phones in the house, but no other computers. August 24, 2023, Interview of Richard S. Tyson (ECF No. 97-2) ("August 24 Tr.") Tr. at 3:2-11. Tyson confirmed that he had a Snapchat account but claimed that he was not required to register it because it was not "social media."

10

June 17 Tr. at 98:24-99:3. He also admitted to having a Facebook Messenger account, June 17 Tr. at 98:4-17, and a Discord account, which is an online messaging and chat platform centered around video games. June 17 Tr. at 98:18-21.

Throughout the interview, Tyson claimed that he was compliant with the sex offender registry requirements and that he was not hiding his Snapchat application from the detectives. Joyner asked Tyson whether he had to register his phone passcodes with the State Police, and Tyson stated that he did not, but that "I can give [the phone passcode] to you. It doesn't matter to me." August 24 Tr. at 22:16-20. Tyson offered to "bring [his Snapchat app] up on the phone and show it to [the officers]." Id. at 25:4-6, 26:9-10 (referencing Discord, "If it's on the phone, you can look at it."); 27:12-13 (referencing Discord, "again, ill [sic] bring it up. I'll show it to you."); 33:13. (emphasis added to the word "it".) Tyson then again confirmed the passcode to Joyner. Id. at 35:14-16. In other words, Tyson voluntarily consent to opening the telephone to secure access to the Snapchat account.

Shortly after, officers executing the search warrant found a different phone than the "everyday" phone to which Tyson had given the detectives the passcode. August 24 Tr. at 43:3-7. Tyson declined to give the passcode for that phone because "there's personal stuff on there that you can . . . misconstrue." Id. at 44:1-5; see generally 43:12-45:25. But, as to the "everyday" phone,

Tyson continued to maintain that "there's no social media things. If that's what you're really looking for, then … can I show it to you myself [and] open it and show it to you myself right here." Id. at 44:8-11 (emphasis added). Tyson told the detectives to "take [the phone] back to your place and look at it" because "if the warrant says that you're looking for something to find -- find social media sites, you're not going to find any." Id. at 47:11-14 (emphasis added); see also 7:8-10 ("No, there's nothing I haven't registered."), 19:1-3 ("You'll see that there's no -- there's no apps or anything that will open up in my name under any social media site on any of my phones."); 70:8-9 (emphasis added) ("I mean, when you get into that phone, you'll see."); 74:10-12 ("I don't believe that anything else you're going to see is going to be - is going to warrant an arrest.").

Thus, the record shows that, on multiple occasions, Tyson stated he did not have issue with the detectives accessing his "everyday" phone to find the Snapchat application and other social media sites. Detective Schwartz outlined to Tyson how detectives perform a "preview" of evidence on site to determine evidentiary value, to which Tyson responded "Well, my main phone, I have no problem with you going through that and looking at it, make sure I don't have any other social media sites." August 24 Tr. at 48:4-6. "In my main phone, I just gave you the passcode for it, you

12

obviously probably already opened it, you see that I don't have anything but what I've told you." Id. at 46:5-8.

In response to Detective Schwartz, Tyson re-confirmed that he was allowing access into the "everyday" phone. Id. at 74:19-25 ("Respectfully, you have two phones. You're, like, yeah, you can get into that phone. You can look all you want. MR. TYSON: Right. But you understand -- DETECTIVE SCHWARTZ: And then that phone, oh, no, I'm not giving you the passcode. MR. TYSON: Right.").

During the August 24, 2023 search warrant, five phones were seized from Tyson's home. June 17 Tr. at 95:1-11. Later, Tyson's roommate turned over a sixth phone of Tyson's to law enforcement. Id. at 95:12-17.

On the same day that the state warrant was executed, Detective Joyner interviewed Belynda Payne, one of Tyson's former coworkers, who was present at the scene of the search warrant. June 17 Tr. at 92:7-9. Payne reported that Tyson has been spending a lot of time with MV1. Id. at 92:12-94:5. Payne also reported that Tyson also had been spending time with another minor victim, Minor Victim Two ("MV2"), and that Tyson had even showed Payne pictures of him with MV1 and MV2 on a trip to Virginia Beach. Id.

Detective Schwartz took defendant's phones back to the Powhatan Sheriff's Office and conducted a preview of the "everyday" phone. September 19 Tr. at 56:14-25; 60:25-61:2. While reviewing the gallery app that contained defendant's photos, he found child

13

pornography. Id. at 56:24-57:6; 58:5-7. After Detective Joyner returned to the office, Detective Schwartz told him about the child pornography on Tyson's phone and showed him a picture of a teenage boy, naked in a bathtub and displaying his genitals. Id. at 15:6-14; 16:3-6. The detectives were later able to identify that teenage boy as MV2. Id.

Because the completion of the interview with Payne at the scene of the search warrant was done before Detective Schwartz confirmed the presence of the child pornography to Detective Joyner (upon his return to the office), Detective Joyner was already aware of Tyson's relationship with MV2 before that confirmation. September 19 Tr. at 15:6-14. Detective Joyner also testified that Tyson's relationship with MV1 had been on his radar long before the execution of the warrant because Joyner's investigation into MF's Snapchat conversations with Tyson dated back several months. June 17 Tr. at 9:19-10:3; 39:14-41:15.

Detective Joyner also testified that, before any child pornography was discovered, he knew the names of MV1 and MV2 from Belynda Payne, knew that Tyson had taken them on multiple trips, knew that MV1 had a room at Tyson's home and was regularly staying overnight, and knew that Tyson "was picking up young boys from school in Powhatan, and also taking boys to Kings Dominion." Id. at 63:16-22. Detective Joyner reports that he had planned to talk to MV1 and his family before the execution of the search warrant,

14

but that he had delayed doing so to avoid tipping off Tyson. Id. at 108:21-109:1.

On August 25, 2023, the day after the search warrant was executed and the "everyday" phone was examined by Detective Schwartz, Joyner met with MV1's mother to set up a forensic interview of MV1, which took place on September 6, 2023. June 17 Tr. at 109:2-8; 110:5-7; 113:6-13. During the meeting with MV1's mother, Joyner asked about MV2. Id. MV1's mother provided Joyner with the phone number of MV2's father. Id. at 109:9-22. Joyner began attempting to contact MV2's father. Id. He ultimately met with MV2's father on August 29, 2023 to set up a forensic interview with MV2, which occurred on September 5, 2023. Id. at 117:1-22. In their forensic interviews, both minor victims reported that Tyson took nude photos of them with his phone. Id. at 113:14-24 (MV1); Id. at 119:7-20 (MV2). Moreover, MV2, in a second interview, reported that, at Tyson's insistence, Tyson and MV2 engaged in oral and anal sex. Id. at 123:12-129:8.

From August 25-29, 2023, Virginia State Police ran a Cellebrite report on all the phones seized during the execution of the search warrant. ECF 73-4, at 1-8. The scans of the phones produced a Cellebrite report, which Detective Joyner first reviewed on August 27, 2023. June 17 Tr. at 134:18-21. The report showed that Tyson had been communicating with MF, MV1, MV2, and several other minors. Id. at 144:24-145:12. In the Cellebrite

15

report, Detective Joyner saw the complete image file of a thumbnail image that he had previously seen in the chat between Tyson and Minor Female in which Tyson sent her a picture of him holding a fish on his boat. Id. at 35:22-36:11; 144:13-23. Detective Joyner also "noticed what appeared to be child pornography" to wit: nude pictures of both MV1 and MV2, and what was later determined (from MV2 himself during his forensic interview) to be videos of sex acts between Tyson and MV2. Id. at 153:15-16; 154:17-156:3. Id. at 85:20-86:18.

Tyson was arrested the same day that the search warrant was executed. June 17 Tr. at 89:22. The arrest was pursuant to an arrest warrant sworn by Detective Joyner on August 22, 2024, for violating Va. Code § 18.2-472.1, failure to register a "social media" or online messaging account. The probable cause was the July 27, 2023 registry form that Tyson had filled out that did not disclose the Snapchat account and that Joyner observed Tyson using to message with MF and others. June 17 Tr. at 89:6-89:22. So, when Tyson was in custody after August 24, 2023, he was in custody pursuant to that previously-obtained arrest warrant.

### d. The Federal Search Warrant

Because the officers executing the search warrant on August 24 had failed to comply with the Virginia statute that required delivery of the search warrant to Tyson upon its execution, the state investigators reached out to special agents at the Federal

16

Bureau of Investigation ("FBI") to determine whether the federal authorities were interested in the case. June 17 Tr. at 146:13-147:1. Detective Joyner sent his case file to the FBI on September 28, 2023. Id. The case file did not include any Cellebrite reports or any pornographic images from Tyson's phones.  Those were obtained by the FBI after the FBI had completed its own federal search warrant. Id. at 167:8-17; June 24 Tr. at 37:15-20; 40:1-4.

On November 17, 2023, FBI Special Agent William Lopez applied for and obtained a federal search warrant for the six phones that were then in the custody of the Powhatan County Sheriff's Office. June 24 Tr. at 16:25-17:3; ECF No. 73-6. In the AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE, ECF No. 73-6 at 2 ("Lopez Affidavit"), Special Agent Lopez set forth the crimes being investigated, the items to be searched, and the probable cause justifying those searches.

First, the Lopez Affidavit states that the warrant would seek evidence and instrumentalities of violating: 18 U.S.C. § 2251(a), Production of Child Pornography; 18 U.S.C. § 2252A(a)(2), Distribution or Receipt of Child Pornography; and 18 U.S.C. § 2422(b), Attempted Coercion and Enticement of a Minor. Lopez Affidavit ¶¶ 4-8. Second, the Lopez Affidavit specifically identifies the six phones taken from Tyson's home as the items to be searched. Id. ¶ 3. Third, the Lopez affidavit sets forth probable cause. Lopez avers three bases of probable cause: (1)

that, during the interview pursuant to the execution to the state search warrant, Tyson admitted to communicating with several minors via social media, and to having a personal relationship with multiple minor males, Id. ¶ 15; (2) that, in a forensic interview with MV1,[5] MV1 reported that Tyson had taken nude photographs of MV1 in exchange for money, and that MV2, in his forensic interview, also reported that Tyson had taken nude photographs of him, id. ¶ 16-17; and (3) that, after Tyson's arrest, in a recorded jail call, Tyson had said:

> I didn't give them [police] the password for the second S10 Plus or the Motorola but I don't think either one of them will be that hard to break into and get stuff off of it and if they can actually take images off of my Gallery I am going to be done. So I probably have 100 counts of child porn because I look at stuff that's underage sometimes, not really bad but like teenagers. It's stupid to keep that shit but who the fuck thought this was going to happen?

Id. ¶ 18. The Lopez Affidavit goes on for several pages describing in detail the complexity of digital evidence and the time requirement for properly analyzing it, necessitating the seizure of the items. Id. ¶¶ 21-27. Magistrate Judge Speight signed the warrant that day, November 17, 2023. ECF No. 73-6 at 1.

---

[5] In the Lopez Affidavit, Special Agent Lopez refers to the person referred to in this memorandum as "MF" as "MV1," and to the minor victims referred to in this memorandum as "MV1" and "MV2" as, respectively, "MV2" and "MV3." So MV1 here refers to the person identified as MV2 in the Lopez Affidavit, and, likewise, MV2 here refers to MV3 there.

When the FBI searched the phones, they found photographs of MV1 and MV2 posing nude and videos of MV2 engaging in sexual acts with Tyson. June 24 Tr. at 19:8-18. The United States indicted Tyson for the enumerated offenses on March 3, 2024.

## DISCUSSION

The analysis of the Second Renewed Motion necessitates an examination of several statutes and rules and of the law governing the applicability of the Fourth Amendment to the United States Constitution. So, first, we will call them to the fore. Then, we will consider Tyson's arguments.

## I.   Relevant Statutes and Rules

Virginia Code § 9.1-903 provides, in relevant part:

> B. Every [registered sex offender] . . . as part of the registration shall . . . provide electronic mail address information, any instant message, chat or other Internet communication name or identity information that the person uses or intends to use . . . .
>
> G. Any person required to register shall reregister either in person or electronically with the local law-enforcement agency where his residence is located within 30 minutes following any change of the electronic mail address information, any instant message, chat or other Internet communication name or identity information that the person uses or intends to use, whether within or without the Commonwealth.

Virginia Code § 18.2-374.1:1 provides, in relevant part:

19

A person shall be guilty of production of child pornography who:

1. Accosts, entices or solicits a person less than 18 years of age with intent to induce or force such person to perform in or be a subject of child pornography; or

2. Produces or makes or attempts or prepares to produce or make child pornography; or

3. Who knowingly takes part in or participates in the filming, photographing, or other production of child pornography by any means; or

4. Knowingly finances or attempts or prepares to finance child pornography.

Virginia Code § 19.2-56 provides, in relevant part:

B. After entering and securing the place to be searched and prior to undertaking any search or seizure pursuant to the search warrant, the executing law-enforcement officer shall give a copy of the search warrant and affidavit to the person to be searched or the owner of the place to be searched or, if the owner is not present, to at least one adult occupant of the place to be searched. If the place to be searched is unoccupied by an adult, the executing law-enforcement officer shall leave a copy of the search warrant and affidavit in a conspicuous place within or affixed to the place to be searched.

. . .

Any evidence obtained from a search warrant executed in violation of this subsection shall not be admitted into evidence for the Commonwealth in any prosecution.

Virginia Code § 18.2-374.1:1 provides, in relevant part, that

"A. Any person who knowingly possesses child pornography is guilty of a Class 6 Felony."

20

Finally, Fed. R. Crim. P. 41 provides, in relevant part:

> (f) Executing and Returning the Warrant.
> (1) *Warrant to Search for and Seize a Person or Property*
> . . .
>     (C) *Receipt*. The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property. . . . Service may be accomplished by any means, including electronic means, reasonably calculated to reach that person.

Failure to comply with Rule 41(f)(1)(C) is a non-constitutional violation that does not require suppression of the evidence unless it was prejudicial to the defendant or an "intentional and deliberate disregard of a provision in the Rule." United States v. Boker, 807 Fed. App'x 232, 235 (4th Cir. 2020); United States v. Simons, 206 F.3d 392, 403 (4th Cir. 2000).

## II.  The Fourth Amendment

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Therefore, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. This amounts to a default rule that "law enforcement must obtain a warrant, grounded in probable cause, before seizing or searching . . . ." United States v. Harris, No.

3:21-cr-18, 2021 WL 2384554, at *3 (E.D. Va. June 10, 2021) (citing United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013)). When a violation of this rule occurs, any evidence derived therefrom can be found to be inadmissible under the exclusionary rule, "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." United States v. Calandra, 414 U.S. 338, 348 (1974); see also Mapp v. Ohio, 367 U.S. 643, 654-55 (1961) (extending the Fourth Amendment and the exclusionary rule to the states through the Fourteenth Amendment).

Without probable cause, a search warrant may not be issued. United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020) "Whether probable cause for a search exists is a 'practical, common-sense' question, asking whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

A search warrant must also fulfill the particularity requirement because "[a]t its core, he Fourth Amendment protects against general warrants that authorize 'exploratory rummaging in a person's belongings . . . by requiring a particular description of the things to be seized.'" United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010) (quoting Andresen v. Maryland, 427 U.S. 463, 480 (1976)). "The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to

22

designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." Id. "Unlike the probable cause requirement, which concerns the showing made by an officer seeking a search warrant, the particularity requirement is focused as well on the officer executing a warrant, and ensures that the search 'will be carefully tailored to its justifications' rather than becoming a 'wide ranging exploratory search[]' of the kind the 'Framers intended to prohibit.'" Blakeney, 949 F.3d at 861 (quoting Maryland v. Garrison, 480 U.S. 79, 84 (1987)).

When a search and seizure is effectuated pursuant to a warrant, it "is limited in scope by the terms of the warrant's authorization." United States v. Phillips, 588 F.3d 218, 223 (4th Cir. 2009). "But the terms of the warrant are not to be interpreted in a 'hypertechnical' manner. Rather, they should be read with a 'commonsense and realistic approach,' to avoid turning a search warrant into a 'constitutional straight jacket [sic].'" Williams, 592 F.3d at 519 (quoting Phillips, 588 F.3d at 223).

## III. State Search Warrant

At the outset, Tyson contends that there cannot be probable cause because Snapchat is not a "social media" platform covered by his registration requirement as a sex offender. Second Renewed Motion at 13. That argument misses the mark. Virginia Code § 9.1-903(b) provides that "Every [registered sex offender] . . . as

23

part of the registration shall . . . provide electronic mail address information, **any instant message, chat or other Internet communication name** or identity information that the person uses or intends to use." (emphasis added). Snapchat is covered by the plain text of the statute because it is an instant messaging platform, and because the term "social media" does not even appear in the statute. The analysis will now turn to the merits of the Second Renewed Motion.

### a. The State Search Warrant Lacked Probable Cause

Tyson argues that there was no probable cause to justify the "extensive" search of his cell phones and electronic devices for child pornography and child erotica because the warrant was directed only to a failure to register a Snapchat account. Second Renewed Motion at 14. The Court agrees.

The state search warrant set forth one statute that Tyson was believed to have violated: Virginia's sex offender failure to register statute, Va. Code § 9.1-903(b). That statute is violated upon a showing that: (1) Tyson is a registered sex offender, (2) who had an online messaging account; and (3) he did not register that account with the appropriate state office within thirty minutes of its creation. Va. Code § 9.1-903(g). Here, the affidavit clearly demonstrates probable cause for the sex offender failure registration violation. ECF No. 73-3, at 10-12. In the probable cause attachment, the Joyner Affidavit outlines: (1) the interview

completed with MF in which she stated she had used Snapchat to communicate with Tyson; (2) the report that was run on MF's phone revealing hundreds of Snapchat messages between MF and Tyson; and (3) the registration form signed by Tyson, a sex offender, on July 27, 2023, which did not disclose any Snapchat account. Id. Thus, the Joyner Affidavit's factual recitation would lead a reasonable person to believe that Tyson, a sex offender, was operating a Snapchat account and had not registered according to the requirements of Va. Code § 9.1-903(g). United States v. Darby, 190 F. Supp. 3d 520, 530 (E.D. Va. 2016), aff'd, 721 F. App'x 304 (4th Cir. 2018) ("There is probable cause for a search when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'") (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

However, the Joyner Affidavit, and its description of items to be seized, encompassed far more illegal conduct than Tyson's failure to register a Snapchat account. In paragraphs 13-16 of the description of items to be seized, the warrant authorizes the search and seizure of "materials relating to child erotica and depictions of minors." ECF No. 73-3 at 8. Paragraphs 14 and 15 specify that, in fact, the warrant was seeking illegal child pornography evidence "as defined in [§] 18.2-374.1," a separate statute from Virginia's failure to register statute.

25

Probable cause does not require that there be an "absolute certainty" that evidence of a crime will be found. United States v. Gary, 528 F.3d 324, 327 (4th Cir.2008). Rather, it requires that there is a "fair probability" that such evidence will be found. United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Here, the Joyner Affidavit does not tell that materials related to child pornography or erotica would be found on Tyson's electronic devices. In fact, the Joyner Affidavit contradicts this possibility by reciting that, in her interview, she and Tyson did not share any sexually explicit materials with Tyson, and that she did not have any sexual relations with him. ECF No. 73-3, at 11-12.

Although the Joyner Affidavit does show the possibility that Tyson had encouraged MV1 to engage MF sexually, that, standing alone, does not amount to suspicion of possession of child pornography. In United States v. Doyle, 650 F.3d 460 (4th Cir. 2011), a search warrant authorizing a search for child pornography in the defendant's home was found to be unsupported by probable cause. Id. at 470. There, the affiant to the search warrant did not participate in the investigation, and, more pertinently, the defendant's three minor victims told law enforcement that the defendant sexually assaulted them but said nothing about child pornography or being shown sexually explicit images. Id. 464-66.

26

The Fourth Circuit held that there was "remarkably scant evidence in the affidavit . . . to support a belief that Doyle in fact possessed child pornography," let alone evidence sufficient to establish a "nexus between the place to be searched," his home, "and the items to be sized," as required. Id. at 471 (quoting United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988)). Here, there is even less cause than the affiant provided in Doyle to believe that Tyson possessed child pornography. This lack of probable cause is further bolstered by testimony of Detective Joyner that the Commonwealth Attorney Powhatan County advised him not to include the "materials relating to child erotica" language due to a lack of supporting probable cause. June 17 Tr. at 82:8-83:23.

For the foregoing reasons, the state search warrant lacked probable cause to support a search into Tyson's electronic devices for child erotica and pornography.

### b. The State Search Warrant Fails the Particularity Requirement and is Overbroad

Moreover, the search warrant fails the particularity requirement and is overbroad in what it allowed to be searched and seized. Search warrants must meet the particularity requirement, because "[a]t its core, the Fourth Amendment protects against general warrants that authorize "exploratory rummaging in a person's belongings . . . by requiring a particular description of

27

the things to be seized." United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010). Indeed, "blanket suppression is warranted where the officers engage in a "fishing expedition for the discovery of incriminating evidence." United States v. Uzenski, 434 F.3d 690, 709 (4th Cir. 2006). In the Fourth Circuit, "a warrant generally satisfies the particularity requirement when it allows officers to seize only evidence of a particular crime." United States v. Young, 260 F.Supp.3d 530, 546 (E.D. Va. 2017) (quotation omitted). Particularity ensures that the search is "confined in scope to ... evidence relating to a specific crime for which there is probable cause." United States v. Davis, 939 F.Supp.2d 535, 564 (2013) (E.D.N.C. 2016).

The search warrant authorized the search and seizure of virtually all computers or electronic media-related devices, including phones or tablets, that Tyson owned and all the data within without regard to whether it was related to his social media registrations. Attachment A (the description of places and items to be searched and seized) to the state search warrant includes over three pages dedicated solely to setting forth every possible piece of electronic equipment that Tyson could own, and all of the different manners in which electronic data could be stored on those devices with no time limits set as to when the data was created or stored. See ECF No. 73-3 at 5-8. The authorization to search all the devices for all their data is not properly tethered to the

28

offense for which there was probable cause: Tyson's failure to register his Snapchat account. To prove that Tyson has failed to register his account under Va. Code § 9.1-903(b), the Government must show that Tyson is a registered sex offender, he had an online messaging account, and that he did not register that account with the appropriate state office within thirty minutes of its creation. Va. Code § 9.1-903(g). A review of relevant decisions teaches that the authorization to search all electronic devices for all of their stored data in relation to a failure to register offense is overbroad.

In Arkansas Chronicle v. Easley, 321 F. Supp. 2d 776 (E.D. Va. 2004), overruled on other grounds, Pearson v. Callahan, 555 U.S. 223 (2009), the district court found to be fatally overbroad a search warrant authorizing the seizure of:

> Any and all computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media capable of storing information in an electronic, magnetic or optical format. This information may include, but is not limited to letters, correspondence, memoranda, journals, electronic mail, image files, database files, deleted files, partial files or other types of files found in the media or computer[.]

In Easley, a newspaper reporter was believed to have pictures and video of the Oklahoma City bombing on his computer which was relevant to the defense of one of the bombers, and a search warrant

issued on that basis. See id. at 778-85. The district court observed that:

> [t]o the extent that the warrant provided any guidance to the officers executing it, it authorized seizure of every piece of computer equipment and every type of document that might be stored on such equipment. In these circumstances, such a warrant essentially amounted to a general warrant giving police the authority to rummage through every single computer file and document with no limitations on which documents could be seized.

Id. at 793 (citing United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995) (finding that a warrant which sought all business records, computer hardware and software, files, ledgers, and invoices lacked particularity because it contained no limitations on which documents within each category of documents could be seized)).

As in Easley, the state search warrant here, is, in essence, a "general warrant" because it authorized the search and seizure of all the electronics in Tyson's home, allowing law enforcement to rummage through Tyson's property in a way not tethered to the suspected violation and with no limitations on what could be seized. Although evidence of the Snapchat account could have been accessed by way of the telephone or computer, and by way of app or web browser, that did not render it necessary to seize and search, e.g., "fixed hard disks, removable hard disk cartridges, tapes,

laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding." ECF No. 23-3 at 7 ¶ 7.

### i. Tyson's View

For his part, Tyson relies largely on a decision from the District of Kansas, United States v. Irving, 347 F. Supp. 3d 615 (D. Kan. 2018) In Irving, the court found that search warrant for a registration offense for Facebook should have been limited to the search of evidence of a registration offense, and that a search warrant allowing a search of the entirety of the defendant's stored data on the Facebook platform was overly broad. 347 F. Supp. 3d at 623. The court held that "the scope of the warrant should have been defined by and limited by [the registration offense]." Id. at 624. The teaching of Irving is persuasive when applied to the similar facts presented here.

### ii. Williams and Cobb

The Government argues that contrary Fourth Circuit precedent controls here. In particular, the Government points to United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010), and United States v. Cobb, 970 F.3d 319, 328-29 (4th Cir. 2020), as holding that a warrant to search a computer may allow the review of every file on the electronic device to determine whether the files can be seized pursuant to the warrant. However, both Williams and Cobb are distinguishable.

In *Williams*, a search warrant was issued in an investigation into messages that were sent to a church threatening harm and sexual assault of schoolchildren. 592 F.3d at 514. The search warrant set forth probable cause for two Virginia crimes: Harassment by Computer (Va. Code § 18.2-152.7:1) and threats of death or bodily injury to a person or member of his family; threats to commit serious bodily harms to persons on school property (Va Code. § 18.2-60). *Id.* at 515-16. The affiant also set forth, based on his training and experience, that adults engaged in this kind of crime often keep images and related documents, including child erotica and sexual texts with minors. *Id.* Based on the affidavit in *Williams*, a magistrate issued a search warrant that authorized the search and seizure of "any and all computer systems and digital storage media, videotapes, videotape recorders, documents, photographs, and [i]nstrumentalities indicat[ive] of the [enumerated offenses]." *Id.* Law enforcement executed the warrant, seized the equipment, and found a DVD that contained child pornography. *Id.* at 516. The Fourth Circuit upheld the district court's denial of the motion to suppress the child pornography, reasoning that the crimes being investigated included using a computer or computer network "to communicate obscene . . . or indecent language, or to make any suggestion or proposal of an obscene nature, or threaten any illegal or immoral act," thus digital data was included within the scope of the elements of the

crime being investigated. Id. at 520. The Court of Appeals also held that the child pornography images were "instrumentalities" of the Computer Harassment charge because it was directly relevant to the prosecution of the alleged offenses that the defendant possessed images in which children were sexually exploited. Id.

In this case, the possession of child pornography is in no sense is related to, or an instrumentality of, the offense of failure to register under Va. Code § 9.1-903(b). The crimes at issue in Williams concerned acts and threats involving minor aged children. Here, the offense of failure to register does not involve minor aged children. The link between child pornography and failure to register asserted in this case is fatally attenuated.

Cobb does not aid the Government either. In Cobb, law enforcement officers sought evidence through a search warrant relating to the investigation of a murder, but the nature of evidence was not known when executing the search warrant. All the investigators knew was that, in a jail house call, the defendant had asked his parents to "wipe" or delete his laptop because he had "some shit" on it. Cobb, 970 F.3d at 323-24. The search warrant for the defendant's residence included "all laptop computers." Id. A second search warrant sought the inside contents of a laptop that had been seized pursuant to the first warrant. The second search warrant authorized the search of the laptop in evidence for "[a]ny material associated with the homicide of [the victim] stored

33

internally on a Gateway laptop computer . . . Any and all other evidence of any other crimes." Id. at 323-24. When the executing officer began to look through the computer, he immediately discovered pornographic images of minors. Id.

In Cobb, the Court of Appeals relied upon the principles that a warrant "need not—and in most cases, cannot—scrupulously delineate each and every item to be seized" and that when a warrant "does not otherwise describe the evidence to be seized, that gap can be filled, at least sometimes, if the warrant instead specified the relevant offense. Id. at 328 (citing Blakeney, 949 F.3d at 862-863). The search of the computer was deemed "sufficiently particular" because the warrant confined "the executing officers' discretion by allowing them to search the computer and seize evidence of a specific illegal activity," the murder being investigated. Id. It was neither "practical nor prudent" to further limit how the police searched through the computer even though the parties could not foretell what evidence would be on the computer. Id.

The Fourth Circuit in Cobb acknowledged that "some computer searches" may "require more specificity as to the place to be searched or the items to be seized." Id. In Cobb, the police did not know what they were searching for, or where it may have been located within the computer or its stored data. In comparison to the present case, law enforcement knew exactly what they were

34

searching for: the Snapchat application on Tyson's phone. It was necessary for the detectives in <u>Cobb</u> to explore through all the computer files to find some undetermined piece of evidence, but for Tyson's failure to register offense the police need only search for Snapchat related information. Here, based on the probable cause relating only to a failure to register, it would have been both practical and prudent for the detectives to limit their search into Tyson's phone.

### c. Tyson's Consent (or Lack Thereof) to the Search of the Phones

Alternatively, the Government argues that Tyson voluntarily consented to the search of his "everyday" phone while being interviewed by Detective Joyner during the execution of the state search warrant. Resp. at 26-30. Tyson, however, contends that under <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968), consent could not be given to search his phone after the detectives executed the search warrant for his electronics, and alternatively if there was any consent given by Tyson to search the phone, it was specifically qualified to mean consent to search the phone solely for "social media applications and Snapchat[.]" Second Renewed Motion at 24-26; Reply at 16-18.

Valid consent is a well-recognized exception to the Fourth Amendment's prohibition against warrantless searches. <u>Trulock v. Freeh</u>, 275 F.3d 391, 401 (4th Cir. 2001) (citing <u>Schneckloth v.</u>

Bustamonte, 412 U.S. 218 (1973)). Consent to search is valid "if it is (1) knowing and voluntary," and "(2) "given by one with authority to consent." United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). In determining whether consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined. United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (citing Schneckloth, 412 U.S. at 227). When analyzing consent, which is a question of fact, it is "appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." Id. (citations omitted). "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." Id. (citing Schneckloth, 412 U.S. at 248-49; United States v. Gordon, 895 F.2d 932, 938 (4th Cir.), cert. denied, 498 U.S. 846 (1990)).

Under the standard set by the Supreme Court in Bumper v. North Carolina, 391 U.S. 543 (1968) and applied by the Fourth Circuit in Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001), Tyson contends that he did not consent and that any consent was not voluntary.

The Government responds that Bumper does not provide a categorical bar against consent being provided after a search warrant has been executed, as the Supreme Court clarified in Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), by expressly adopting a totality of the circumstances test.

Tyson heavily relies on Bumper, where the police searched a house that the defendant shared with his grandmother. Upon arrival, an officer told the defendant's grandmother that they had a search warrant, to which she responded, "go ahead," and opened the front door. Bumper, 391 U.S. at 547. The Supreme Court held that there was no valid consent because it was given only after the official conducting the search asserted that he possessed a warrant, id. at 550, and that acquiescence to an assertion of lawful authority does not constitute consent under the Fourth Amendment. The Fourth Circuit agreed in Trulock, stating "acquiescence to an assertion of lawful authority does not constitute an understanding, intentional and voluntary waiver of rights under the Fourth Amendment". 275 F.3d at 402 (quoting Bumper at 549-50).

But that does not change the fact that the Supreme Court in Schneckloth found that the knowledge of the ability to deny a search is only a part of the analysis to be completed. In Schneckloth, the Supreme Court held that Bumper renders consent invalid ""**if under all the circumstances** it has appeared that the

consent was not given voluntarily—that it was . . . granted only in submission to a claim of lawful authority." 412 U.S. at 233 (emphasis added). The Supreme Court established that "proof of knowledge of a right to refuse" a search was not "the sine qua non of an effective consent to search." Id. at 234. The Fourth Circuit has adopted this approach, and has held that the question of whether consent is voluntary, rather than "the product of duress or coercion, express or implied — is one 'of fact to be determined from the totality of all the circumstances.'" United States v. Azua-Rinconada, 914 F.3d 319, 324 (4th Cir. 2019) (quoting Schneckloth, 412 U.S. at 233). Thus, Tyson's reliance on Bumper alone fails, and the Court must look at the totality of the circumstances to determine if Tyson consented to the search of his phone.

When officers executed the search warrant at Tyson's home on August 24, 2023, Tyson was escorted out of his home, and before entering a police car with Detectives Joyner and Schwartz, he was told that the officers had a search warrant. June 17 Tr. at 90:10-19. After reading Tyson his Miranda rights, Detective Joyner informed Tyson that they were executing the search warrant at his home for electronics and went over with Tyson the types of electronics that they were looking for. August 24 Tr. at 1:5-21; 2:23-3:24. Detectives Joyner and Schwartz made it clear the search warrant covered his phone and discussed with Tyson the details of

38

what his main phone looked like, and asked if other phones were in the house. Id. at 3:10-4:7. Detective Joyner re-iterated twice to Tyson that they were searching the house for electronic devices, Id. at 6:1-10; 11:12-18, before again discussing what the cell phones at issue looked like. Id. at 13:5-14:8. Detective Joyner continued to remind Tyson that officers were searching for his electronic devices pursuant to the search warrant. See, e.g., id. at 15:9-14 ("We're going to look at all the electronic devices. . . that's what we're here for."); see also 16:5-12; 18:15-18.

Detective Joyner eventually turned the conversation to phone passcodes, to which Tyson immediately volunteered the passcode to his everyday phone, stating "I can give it to you. It doesn't matter to me." Id. at 22:16-21. When the officers brought up the issue of Tyson's use of Snapchat, Tyson responded "I can bring it up on [the] phone and show it to you." Id. 25:4-9. Also the Discord application, Tyson told the detectives "[i]f it's on the phone, you can look at it" and "if you'll bring the phone here, I'll show it to you." Id. at 26:5-27:16.

Detective Schwartz again re-iterated to Tyson that "the search warrant is just for electronics so that we can dive into them and make sure there's nothing there." Id. at 42:11-16 (emphasis added). Tyson then refused to provide the passcode to a different phone that the officers had found during the search, and Schwartz pushed back asking for the passcode so the officers "can

39

get into the stuff quickly, without having to use a whole bunch of forensic software. . . I believe it would expedite all of this[.]" Id. at 43:12-23. Tyson responded by saying the phone may have personal stuff that could be "misconstrue[d]" and offered "there's no social media things. If that's what you're really looking for, then [I] can show it to you myself[.]" Id. at 44:1-11.   Tyson expressed his understanding by saying to the officers that "they have a general search warrant" and that the officers can "take [the phones] back to where you take them back, and you look at them[.]" Id. at 46:20-24. He confirmed to the officers that they would "take [the phone] back to your place and look at it[.]" Id. at 47:9-18. Again, Tyson told the detectives that "I have no problem with you going through that [his every-day phone] and looking at it, make sure I don't have any other social media sites." Id. 48:4-16. But, as to the phone to which he would not provide the passcode, Tyson stated that "hopefully the warrant is more [] specific to, you know, social media sites[.]" Id.

Near the end of the interview, Detective Schwartz told Tyson that they are working to confirm and corroborate his failure to register, to which Tyson responded, "if that's what you're doing, if that's all you're doing, then taking that back to your office and [] opening the phone up and finding that **under the search warrant is fine.**" Id. at 74:1-9 (emphasis added).   He then again

40

told officers, "when you're looking for something specific, the warrant has to say something specific." Id. at 75:5-17.

With all of these facts in mind, the inquiry becomes: what does the totality of the circumstances tell about Tyson's intention to have voluntarily consented to the extensive search that occurred here? There are facts that point in opposite directions.

To begin, there are, indeed, several facts that augur in favor of finding that voluntary consent was given. Upon the execution of the search warrant, Tyson was put in the front seat of the police vehicle to be interviewed by Detectives Joyner and Schwartz without any handcuffs or restrictions placed on him. June 17 Tr. at 90:17-19; September 19 Tr. at 35:2-5. Tyson was immediately read his Miranda rights before he waived his right to counsel and agreed to answer questions. August 24 Tr. at 1:1-24; see United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001) (finding that the reading of Miranda rights factors in favor of finding voluntary consent). The detectives acted in a cordial manner towards Tyson throughout the entirety of the interview, repeatedly addressing him as "sir." August 24 Tr. at 21:21, 25:24, 26:25, 29:13, 65:2; see United States v. Robertson, 736 F.3d 677, 681 (4th Cir. 2022) (interactions "characterized by relaxed, friendly conversation between the two sides" indicate voluntary consent); United States v. Contreras, 506 F.3d 1031, 1037 (4th Cir. 2007) (officers' "casual phrasing of [his] request" suggested absence of coercion).

41

Further, on multiple occasions, Tyson claimed that he did not have material that he was hiding; and, on multiple occasions, he told the officers, in a seemingly nonchalant manner, that they could look inside his everyday phone. Compare August 24 Tr. at 22:16-20 ("I can give [my passcode] to you. It doesn't matter to me."), with United States v. Smith, No. 3:22CR90 (DJN), 2023 WL 25349, at *9 (E.D. Va. Jan. 3, 2023) ("Defendant's responses to Officer Gilbert's requests carry an air of nonchalance —'Yeah, it ain't nothing.'— suggesting that Defendant felt unbothered, and certainly not coerced.").

Also, Tyson gave the passcode to the everyday phone but refused to provide the detectives with the passcode to a second phone that was found in the execution of the search warrant, August 24 Tr. at 74:19-25. Thus, it is reasonable to infer that Tyson knew that he did not have to provide his passcodes to the detectives. United States v. Elie, 111 F.3d 1135, 1146 (4th Cir. 1997) ("By revoking his consent to search certain documents in his rooms, [the defendant] conclusively demonstrated that he knew of his right to refuse consent."); Schneckloth, 412 U.S. at 249 (noting that although the accused's knowledge of his right to refuse consent is not a prerequisite in establishing consent, it is a factor).

Finally, these interactions occurred in the backdrop of Tyson as an individual familiar with the criminal law system as a

convicted sex offender, certainly not a newcomer to the law. This factor weighs in favor of a voluntary consent. Boone, 245 F.3d at 362 (A finding that the defendant was "a convicted felon, which suggests he was not a newcomer to the law", militated in favor of finding voluntary consent). Thus, the decisions cited by the Government, applied to the foregoing facts, tend to support a finding of voluntary consent.

However, each of the cases cited by the Government, excluding Parrish which will be discussed later (pp. 45-46), the finding of voluntary consent occurred in the context of a warrantless search where no assertion was made by the officers that they were acting pursuant to a search warrant.[6] Here, before any questioning of Tyson commenced, he was immediately informed that a search warrant was being executed upon his house. August 24 Tr. at 1:1-24. Detective Joyner made it immediately and repeatedly clear to Tyson that they had a search warrant for all electronics, including cell

---

[6] See Boone, 245 F.3d at 360 (analyzing consent given through consent form signed after a warrantless Terry stop); United States v. Strache, 202 F.3d 980, 986 (7th Cir. 2000) (analyzing consent given to a warrantless search); United States v. Sanchez-Valderuten, 11 F.3d 985, 990 (10th Cir. 1993) (consent given to warrantless search of vehicle); United States v. Hernandez, 872 F. Supp. 1288, 1295 (D. Del. 1994) (same). The cases that Court adds in its analysis in the preceding paragraph concern warrantless searches as well. See Robertson, 736 F.3d at 680-81 (no consent to warrantless search performed outside bus stop); Contreras, 506 F.3d at 1037 (voluntary consent to warrantless search of vehicle trunk); Smith, 2023 WL 25349 at *8 (valid consent to warrantless search of bag); Elie, 111 F.3d at 1146 (valid consent to warrantless search of hotel room).

phones, that were present in his house. Detective Joyner made that assertion of authority again and again throughout the interview. August 24 Tr. at 1:5-21 ("we are doing a search warrant at your house"; 2:23-3:24 ("we're doing the search warrant at your house because you do have electronics, [] right?"); 3:10-4:20 ("Do you have that cell phone on your person right now or is it inside? . . . when we start searching, we want to know whose phone we're looking at"); 6:1-10 ("again, when we go in the house and start looking, we want to know what we're looking for as far as if there's any computers"); 11:12-18 ("we need to make sure, like, the search warrant is for electronic devices. So, we'll look through all the electronics"); 15:9-14 ("You say you have some old phones. Do you remember what kind of phones they are?"); 16:5-12 (the only way to make sure you don't have anything else is to — to look at the electronics, look at those devices. And that's all we're doing."); 18:15-18 ("What we'd like to do is to just quickly make sure there's nothing on any electronic devices"); 42:11-16 ("the search warrant is just for electronics so that we can dive into them and make sure there's nothing there"); 46:20-24 (Tyson confirming to Detective Schwartz that: "you guys have a general blanket search warrant for electronics, and then you take them back to wherever you take them back, and you look at them").

Like in Bumper, this situation was "instinct with coercion" because "[w]hen a law enforcement officer claims authority to

search a home [or telephone] under a warrant, he announces that the occupant has no right to resist the search." 391 U.S. at 549-50. The Government cannot discharge its obligation to prove free and voluntary consent by "evinc[ing] nothing more than acquiescence to a claim of lawful authority." United States v. Lattimore, 87 F.3d 647, 653 (4th Cir. 1996) (citing Bumper, 391 U.S. at 549); Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001).

Further, in violation of a Virginia statute, Tyson was never provided with a copy of the search warrant that stated the officers were searching for child erotica. Thus, he had no reason to object to the search on that basis. That is significant because, during the interview, Tyson continually asked officers what the search was about. In view of how clear it was made to Tyson that the officers were going to search his phones under the search warrant, Tyson's giving of the phone passcode is more akin to an acquiescence of authority than it is to voluntary consent. In this case, the consent claimed by the Government is not borne out by the record. And, this factor weighs heavily in assessing the totality of the circumstances.

The Government cites a single out of circuit case where a court found voluntary consent to a search after the execution of a search warrant: United States v. Parrish, 942 F.3d 289 (6th Cir. 2019). The facts of Parrish are quite different than those presented on the record. In Parrish, the Sixth Circuit found that

45

a man gave voluntary consent to search his phone after the execution of a search warrant for child pornography in the man's house. The man was given the search warrant before going into a congenial interview in which he removed and changed the passcode to his phone before handing it over to police officers. Id. at 292-293. The Sixth Circuit focused this holding on the fact that the "record contain[ed] no evidence. . . that the officers told Parrish the warrant covered the cell phone before asking for his consent to search it." Id. at 294. Here, Detective Joyner made it abundantly clear the phones were subject to the search warrant before Tyson volunteered his passcode. Also, unlike the defendant in Parrish, Tyson was also never provided with the search warrant and could not have reviewed it to understand what the search warrant covered.

Considering the totality of the circumstances, the records shows that Tyson acquiesced to a claim of lawful authority. Thus, the Government's alternative consent argument fails.

### d. Good Faith Exception

The Government argues that, if the state search warrant is deemed unconstitutional for lacking sufficient probable cause or for being overbroad, the good-faith exception applies, and the evidence is not subject to exclusion. In rebuttal, Tyson argues that two exceptions to the good faith exception apply, contending that the affidavit was so lacking in probable cause as to render

46

the officer's belief in it unreasonable and that the magistrate in signing the state search warrant was misled by the language involving child erotica that was mistakenly left in the affidavit.

Judicial review of a search warrant signed by a neutral and detached magistrate must accord certain weight to the magistrate's decision. "When reviewing a magistrate judge's probable cause determination, a court looks to whether there was a substantial basis for the decision." United States v. Hurwitz, 459 F.3d 463, 473 (4th Cir. 2006). "After-the-fact scrutiny by courts of the sufficiency of an affidavit should accord great deference to the magistrate's determination of probable cause. Id. (internal quotations omitted). In fact, the point of the exclusionary rule is to deter future misconduct. So, where "officers conduct[] searches in good faith reliance on . . . warrants [signed by magistrates]," the exclusionary rule should not apply. United States v. Burton, 756 Fed. App'x 295, 297 (4th Cir. 2018); see also United States v. Leon, 468 U.S. 897, 903 (1984). This is known as the "good faith" exception.

The law recognizes four instances where the good faith exception to the exclusionary rule does not apply:

> (1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-

> *Ji Sales, Inc. v. New York*, 442 U.S. 319
> (1979); **(3) if the affidavit supporting the
> warrant is so lacking in indicia of probable
> cause as to render official belief in its
> existence entirely unreasonable;** and (4) if
> under the circumstances of the case the
> warrant is so facially deficient--i.e., in
> failing to particularize the place to be
> searched or the things to be seized—that the
> executing officers cannot reasonably presume
> it to be valid.

*United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011) (internal quotations omitted) (emphasis added); *Leon*, 468 U.S. at 923. In *Doyle*, the Fourth Circuit found that the third exception to the good faith exception was present; that the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Id.* at 470–76. The Fourth Circuit held that, "when considering the application of the good faith exception, courts 'should examine the totality of the information presented to the magistrate in deciding whether an officer's reliance on the warrant could have been reasonable.'" *Id.* at 471. There, law enforcement officer relied upon faulty, inconsistent evidence, and moreover, the evidence only supported the reasonable belief that child molestation had occurred, not that any illicit images were taken or possessed. *Id.* at 472 ("[E]vidence of child molestation alone does not support probable cause to search for child pornography.").

The probable cause alleged in the Joyner affidavit is even more attenuated in its connection to the possession of child

pornography than was the affidavit was in Doyle. When looking at the "totality of information presented to the magistrate," there is nothing in the Joyner affidavit to show probable cause for Tyson's possession of child pornography. Id. at 471. Tyson's search warrant was for an investigation into a failure to register, an offense which does not by itself involve the possession of child pornography in any manner. Like in Doyle, evidence of failure to register alone does not support probable cause to search for child pornography. See id. at 472. There are no statements in the Joyner affidavit stating that Tyson possessed child pornography or that would indicate in any manner that Tyson would be in possession of child pornography. Therefore, the Court concludes that an "objectively reasonable officer" in the present circumstances could "not rely on a warrant application so devoid of necessary information." Id. at 476; Leon, 468 U.S. at 923. Because the reliance on the warrant is not objectively reasonable, the good faith exception recognized in Leon is inapplicable. Leon, 468 U.S. at 903.

## II. Federal Search Warrant

Tyson argues that the evidence derived even from the federal search warrant also must be suppressed because it is improperly derived from the state search warrant, i.e., it is "fruit of the poisonous tree." The record is to the contrary.

## a. Fruit of The Poisonous Tree and the Independent Source Doctrine

A remedy for a violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct. See Mapp v. Ohio, 367 U.S. 643, 648 (1961). Courts may also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." United States v. Oscar-Torres, 507 F.3d 224, 227 (4th Cir. 2007) (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)). Ultimately, "the critical inquiry is whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. (citation and internal quotation marks omitted). The Fourth Circuit requires Tyson to show a strong nexus between the exclusion of the evidence and a real deterrent effect on the behavior of law officers:

> "[I]t is not enough to show that unlawfully seized information 'gives an impetus or direction toward what is to be focused on by the government.' Rather, the nexus must be so direct that the application of the exclusionary rule would have a real deterrent effect on the behavior of law enforcement officers, for '[a]s with any remedial device, the application of the rule [should be] restricted to those [situations] where its remedial objectives are thought most efficaciously served.'"

United States v. Hoang Anh Thi Duong, 156 F. Supp. 2d 564, 576 (E.D. Va. 2001) (citing United States v. Calandra, 414 U.S. 338, 348 (1974).

However, where there is an independent and legal source for evidence that also was secured by an illegal search warrant, the evidence should not be excluded. "Almost simultaneously with [the Supreme Court of the United States'] development of the exclusionary rule, in the first quarter of [the twentieth] century, [the Supreme Court] also announced what has come to be known as the 'independent source' doctrine." United States v. Murray, 487 U.S. 533, 537 (1988); see Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920). The independent source doctrine provides that, "[w]hen the challenged evidence has an independent source" from an illegal warrant, "exclusion of such evidence" is not warranted. Murray, 487 U.S. at 537; Nix v. Williams, 467 U.S. 431, 443 (1984). "Thus, under the 'independent source' doctrine, when the police discover a particular fact by illegal means but later acquire knowledge of that same fact by independent, legitimate means, evidence of that fact is not excludable as fruit of the police misconduct." United States v. Mowatt, 513 F.3d 395, 404 (4th Cir. 2008), abrogated on other grounds, Kentucky v. King, 563 U.S. 452 (2011).

"This doctrine applies when a 'search pursuant to [a] warrant was in fact a genuinely independent source of the information and

tangible evidence' that would otherwise be subject to exclusion because they were found during an earlier unlawful search." <u>United States v. Hill</u>, 776 F.3d 243, 251 (4th Cir. 2015) (quoting <u>Murray</u>, 487 U.S. at 542). "To find the search with a warrant 'genuinely independent,' the unlawful search must not have affected (1) the officer's 'decision to seek the warrant' or (2) the magistrate judge's 'decision to issue [it].'" <u>Id.</u> (quoting <u>Murray</u>, 487 U.S. at 542).

The record here establishes that the federal search warrant and the supporting Lopez Affidavit issued to search Tyson's phones that had been originally seized during the state search warrant are not fruit of the poisonous tree. The results of the illegal state search warrant did not (1) affect Special Agent Lopez's decision to seek the warrant, or (2) affect Magistrate Judge Speight's decision to issue it. The federal search warrant was fully and properly supported by independent sources of probable cause.

**b. The Federal Search Warrant Is Not Fruit of the Poisonous Tree Because It Was Based on Sufficient Independent Sources**

Special Agent Lopez in his supporting affidavit to the federal search warrant offered three bases of probable cause: (1) Tyson's statements in his interview with Detective Joyner, during the August 24, 2023 search and arrest warrants' executions, that he communicated with minors via social media and admitted to having

52

personal relationships with several of them; (2) MV1 and MV2's statements during their forensic interviews that Tyson took nude photos of them on several occasions; and (3) Tyson's statements in the recorded jail call that he had "100 counts of child porn" on his phones "because [he] look[ed] at stuff that's underage sometimes . . . ." Lopez Affidavit ¶¶ 15-18. Taking each of these sources of probable cause in turn, it is evident that the Lopez Affidavit did not rely on any evidence derived from the illegal state search warrant.

First, the affidavit points to the interview that Tyson completed with Detective Joyner and Schwartz during the execution of the state search warrant. During that interview, Tyson voluntarily spoke with the detectives and made several statements regarding his personal relationships and various communications with minors, including both FM and MV1. Tyson even stated on August 24 that law enforcement would "find stuff that he could be arrested for immediately because we would say it's child porn." June 17 Tr. at 102:13-19. The execution of the search warrant and the interview occurred in tandem, with no opportunity for the evidence derived from the search of the phones to have tainted what Tyson voluntarily stated to the officers.

Second, MV1 and MV2's interview responses are not tainted by the state search warrant. Detective Joyner's testimony reveals the timeline for how he came to know both minor victims and initiate

both of their forensic interviews. Joyner knew of MV1 as early as June 2023 because of his interview with MF and her grandfather, and from reviewing the Snapchat conversations on her phone with Tyson and MV1. As early as July 7, 2023, Joyner knew that MV1 had a room at Tyson's house from his interview with Randi Lanzafama. June 17 Tr. at 60:12-21; 62:9-63:22; 64:25-65:16. By August 24, 2023, Joyner knew, from his interview with Belynda Payne, that Tyson had taken MV1 and MV2 on a trip to Virginia Beach. June 17 Tr. at 93:17-25. The search warrant was executed on August 24, 2023, too, but Detective Joyner was not apprised by Detective Schwartz that an initial review of the phone found alleged child pornography until his return to the office after the interview with Belinda Payne. September 19 Tr. at 15:6-14, 56:14-25, 60:25-61:2; June 17 Tr. at 93:5-7. Detective Joyner, as an experienced investigator, had already decided to investigate MV1 before learning of the child pornography, and he was made aware of the existence of MV2 before any results of the search warrant could have tainted the likelihood of those interviews occurring.

Finally, Tyson's jailhouse call is not tainted by the state search warrant. Tyson was in custody pursuant to an <u>arrest</u> warrant for violating Va. Code § 18.2-472.1, the failure to register offense. The validity of that arrest warrant is uncontested. Tyson was not arrested based on any probable cause obtained as a result of the state search warrant. While in custody after that arrest,

Tyson made the call and admitted to having and viewing child pornography. Lopez Affidavit ¶ 18. This admission on the recorded line is neither tainted by, nor resulting from, the execution of the state search warrant.

All three sources of probable cause for the federal warrant are sufficiently independent under the standard set by the Supreme Court. Under Murray and its progeny, "[t]o find the search with a warrant genuinely independent, the unlawful search must not have affected (1) the officer's decision to seek the warrant or (2) the magistrate judge's decision to issue it." United States v. Banks, 2024 WL 2989710, at *2 (4th Cir. June 14, 2024) (quoting United States v. Hill, 776 F.3d 243, 250 (4th Cir. 2015)). Joyner testified that he specifically did not produce any of the Cellebrite reports to the FBI. June 17 Tr. at 170:6-171:16. Likewise, Special Agent Lopez testified that, when he received Detective Joyner's reports in September 2023, he did not receive or view any of the images on Tyson's phones. June 24 Tr. at 40:1-4. The probable cause statement outlined in the Lopez Affidavit is independent from the evidence that came from the state search warrant's dive into the cell phones, and provides more than sufficient probable cause for Agent Lopez to have sought the federal warrant to search the cell phones. Thus, the first requirement of Hill is satisfied.

Further, Magistrate Judge Speight was in no manner influenced by the state search warrant in her decision to issue the federal search warrant. The information that was presented to Magistrate Judge Speight was independent of the state search warrant and investigation. Based on that information, Magistrate Judge Speight made the informed decision to issue the federal warrant. None of the allegedly tainted evidence was presented to Magistrate Judge Speight, so it could not have formed any basis on her finding of probable cause when issuing the federal warrant. So, the second requirement of Hill is satisfied, and the federal search warrant is properly based on probable cause established through independent sources.

Tyson argues that United States v. Tapia, 2022 U.S. Dist. LEXIS 83964 (S.D. Ohio May 10, 2022) controls here. Second Renewed Motion at 32-33. In Tapia, the court deemed an affidavit for a subsequent federal warrant to be the tainted fruit of an earlier illegal state search warrant. Tapia, 2022 U.S. Dist. LEXIS 83964 at *56. However, Tyson ignores that, in Tapia, the probable cause outlined in the subsequent federal warrant was the evidence derived from the state search warrant. Id. Here, Agent Lopez was not using the "tainted fruit" of the state search warrant.

Tyson's claim that the federal investigation was tainted because the FBI received the case file from the state investigation holds no water either. Tyson seemingly conflates the illegality of

the state search warrant to mean that entire investigation into Tyson was illegal. Tyson concedes as much when admitting that the "FBI did not technically rely on the cell phone" but deems it was tainted because "every other part of the state investigation was handed over." ECF No. 106 at 14. The FBI could not rely on the illegally derived evidence, but it certainly was entitled to rely on the work that was done before the execution of the state search warrant.

Special Agent Lopez based his application for the federal search warrant on three probable cause grounds that would have been legitimately known with or without the state search warrant. Magistrate Judge Speight signed the warrant based on the presentation of that legitimately obtained information. The federal search warrant, therefore, was untainted by the state search warrant.

### c. Federal Rule of Criminal Procedure 41(f) Does Not Lead to Exclusion

Tyson's final argument for the exclusion of the evidence taken during the execution of the federal search warrant is the FBI's failure to follow Federal Rule of Criminal Procedure 41(f) by not providing a copy of the federal search warrant to Tyson upon its execution. MOTION at 33-35. This argument is based on a flawed reading of Rule 41(f) and its requirements. The relevant part of Rule 41(f)(1)(C) states:

(1) Warrant to Search for and Seize a Person or Property.

> (C) Receipt. The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

The controlling language of Rule 41(f)(1)(C) is that a copy of the warrant and a receipt for the property taken must be given to "the person from whom, or from whose premises, the property was taken." The rule is alternatively satisfied, noted by the use of conjunctive use of the word "or," by leaving the warrant and receipt at the place where the officer took the property.

Here, the actions of the federal agents in executing the federal search warrant comply with the plain language of the Rule 41(f)(1)(C). Federal agents provided federal search warrant and the receipt of the property to be seized to the Powhatan County Sheriff's Office, which had possession of the phone on their premises after the execution of the state search warrant. June 24 Tr. at 19:19-20:6. By leaving the search warrant and receipt at the Powhatan County Sheriff's Office, the organization in possession of and also the premises in which the property at the time was located, federal agents complied with Rule 41(f)(1)(C).

Even if the Court were to accept Tyson's argument that this is a violation of Rule 41, Fourth Circuit precedent still does not support exclusion. "There are two categories

58

of Rule 41 violations: those involving constitutional violations, and all others." United States v. Boker, 807 Fed. Appx. 232, 235 (4th Cir. 2020) (quoting United States v. Simons, 206 F.3d 392, 403 (4th Cir. 2000). "Non-constitutional violations of Rule 41 warrant suppression only when the defendant is prejudiced by the violation or when there is evidence of intentional and deliberate disregard of a provision in the Rule." Id. (internal citations and quotation marks omitted). "[T]he Fourth Amendment is not offended where the executing officer fails to leave a copy of the search warrant with the property owner following the search ... or fails even to carry the warrant during the search." Id. (quoting United States v. Hurwitz, 459 F.3d 463, 472 (4th Cir. 2006). It is not a realistic argument that the federal officers were acting intentionally and in deliberate disregard of Rule 41(f)(1)(C) by complying with its plain language. And, indeed, there is no evidence to support such an argument.

## CONCLUSION

For the reasons set forth above, the DEFENDANT'S SECOND RENEWED MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 102) was denied pursuant to the Court's Order on January 10, 2025. (ECF No. 110).

It is so ORDERED.

/s/  REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: January 13, 2025

60