IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                        Criminal No. 3:24-cr-34

RICHARD SCOTT TYSON,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the MOTION TO RECONSIDER COURT'S RULING ON INDEPENDENT SOURCE (ECF No. 136) ("the Motion for Reconsideration"). For the reasons set forth below, the Motion for Reconsideration will be DENIED.

## PROCEDURAL HISTORY

On March 5, 2024, a Grand Jury sitting in the Eastern District of Virginia returned an INDICTMENT (ECF No. 1) against Defendant Richard Scott Tyson, a/k/a Richard Samuel Tyson ("Tyson" or "Defendant"), charging him with one count of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), and one count of Attempted Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b). The INDICTMENT also contained a forfeiture allegation.

On April 26, 2024, the Defendant filed a MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 18) ("First Motion to Suppress"). Because of scheduling conflicts, the evidence was heard in three sessions.

On June 11, 2024, Detective Traquan Gregory of the Goochland County Sheriff's Office, testified. COMPLETE TRANSCRIPT OF TESTIMONY OF DETECTIVE GREGORY BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 50) ("June 11 Tr."). On June 17, 2024, Detective Danny Joyner, of the Powhatan County Sheriff's Office, testified. COMPLETE TRANSCRIPT OF MOTIONS BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 62) ("June 17 Tr."). On June 24, 2024, Special Agent William Lopez and Special Agent Matthew Marasco, of the Federal Bureau of Investigation ("FBI"), testified. COMPLETE TRANSCRIPT OF MOTIONS BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 69) ("June 24 Tr.").

Having heard that testimony, the Court denied the First Motion to Suppress, with leave to re-file because the memoranda in support of, and in opposition to, the First Motion to Suppress were not tethered to the testimony presented at the evidentiary hearings. ORDER of June 25, 2024 (ECF No. 58).

Thereafter, on June 26, 2024, a SUPERSEDING INDICTMENT (ECF No. 59) was returned against Tyson. It added one count of committing Counts I through III while being an individual required by federal or other law to register as a sex offender, in violation

2

of 18 U.S.C. §§ 2251 and 2422; and, two counts of Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(1).[1]

On July 31, 2024, Tyson filed the DEFENDANT'S RENEWED MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 73) ("Renewed Motion"). On August 19, 2024, the Court heard evidence on the Renewed Motion in the form of testimony from Detectives Danny Joyner and Austin Schwartz. COMPLETE TRANSCRIPT OF TESTIMONY OF DETECTIVES JOYNER AND SCHWARTZ BEFORE THE HONORABLE ROBERT E. PAYNE (ECF No. 99) ("Sept. 19 Tr."). Following hearings on the Renewed Motion, the Court denied the Renewed Motion without prejudice to the filing of a Second Renewed Motion. (ECF No. 98). On October 22, 2024, Tyson filed the DEFENDANT'S SECOND RENEWED MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 102) ("Second Renewed Motion"). On January 13, 2025, the Court entered the MEMORANDUM OPINION (ECF No. 112) ("Memorandum Opinion") that denied the Second Renewed Motion. On March 13, 2025, Tyson filed the Motion for Reconsideration of the Memorandum Opinion's holding on the "independent source doctrine."

Tyson has not identified any facts that have either changed or been newly discovered since the Memorandum Opinion was entered.

---

[1] The Obstruction of Justice counts are based on allegations that Tyson contacted witnesses with the intent to influence their testimony and to have them destroy evidence. ECF No. 59 at 3. The alleged behavior surrounding those counts does not impact the analysis of the Second Renewed Motion.

The facts necessary to decide the Motion for Reconsideration are set forth in the SUPERSEDING INDICTMENT, the briefs, the exhibits, and the testimony produced at the above-cited evidentiary hearings. The facts do not differ from that on which the Memorandum Opinion was based. Nonetheless, it is best to record them here.

## FACTUAL BACKGROUND

### a. The Initial Investigation and State Search Warrants

The investigation into Tyson's conduct began when a concerned grandparent contacted law enforcement officials in Powhatan County because his teenaged granddaughter, minor female ("MF"), was having online conversations with adult men. RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO SUPPRESS ("Resp."), ECF No. 105, at 1-2 (citing Affidavit of Powhatan County Detective Joyner in Support of the August 22, 2023 Search Warrant ("Joyner Affidavit"), ECF No. 73-3 at 10).

The affidavit in support of the state search warrant for Tyson's home outlines in detail how the investigation commenced. ECF No. 73-3 at 10-12. MF's grandfather became aware that she had been "Snapchatting"[2] with several adults, including Tyson whom the

---

[2] Snapchat is a popular messaging application primarily accessed as an application ("app") on a smartphone that that lets users exchange pictures and videos (called snaps) that are meant to disappear after they are viewed. June 17 Tr. at 11:19-23; 12:7-11. Snapchat is usually accessed and used by way of the app, but users can still use Snapchat by way of computer, without the app. June 17 Tr. at 12:7-13.

grandfather knew to be a registered sex offender. Id.; June 17 Tr. at 6:18-7:2; 11:1-12. On June 13, 2023, the grandfather turned MF's phone over to Powhattan County law enforcement officials. ECF No. 73-3 at 10. On June 21, 2023, Detective Joyner of the Powhatan County Sheriff's Office interviewed MF, who reported that she had, in fact, been snapchatting with Tyson. Id. at 11. MF also reported that Tyson had not sent her explicit images or text with sexual content, and had not requested either from her. Id. at 11. Also, on June 21, 2023, Detective Joyner obtained MF's consent, and that of her mother, to run a Cellebrite[3] report on MF's phone. That report was run later that day. Id.; June 17 Tr. at 16:19-17:1; 18:1-11. The report revealed hundreds of Snapchat messages between MF and several adults, including Tyson. Id. at 11-12; June 17 Tr. at 38:7-24. The messages also revealed that Tyson had arranged meetups between MF and her boyfriend. Id. That boyfriend is an alleged victim of the conduct which Tyson is charged, and is identified in the SUPERSEDING INDICTMENT as Minor Victim 1 ("MV1"). The messages showed that: (i) Tyson had offered to let MF and MV1 come swim in his hotel pool; (ii) Tyson gave MF rides home; and (iii) Tyson had messaged MF, on Snapchat, late into the night on

---

[3] Cellebrite is a software used by law enforcement agencies through which they scan phones and create a detailed easily readable report of all the information contained within the data on the phone. June 17 Tr. at 18:1-22:17.

several occasions. Id. The messages on MF's phone between MF and MV1 revealed that, according to MV1, Tyson had offered to arrange for MF and MV1 to spend time together and had encouraged MV1 to engage in sexual behavior with MF. Id. Detective Joyner testified that, based on the content of the messages between MF and Tyson, he believed Tyson was "grooming" MF for a subsequent approach by Tyson. Id. at 12.

On June 30, 2023, MF was forensically interviewed at the Davis Child Advocacy Center in Chesterfield. Id. During the interview, MF did not disclose that anything sexual or sexually suggestive had happened between her and Tyson. Id.

Virginia law requires convicted sex offenders to register "any instant message, chat or other Internet communication name or identity information that the person uses or intends to use." Va. Code. § 9.1-903(B). Detective Joyner checked the Virginia State Police sex offender registry and confirmed that Tyson was a registered sex offender. June 17 Tr. at 61:19-62:8. He then found a registration form dated July 27, 2023, and signed by Tyson that did not disclose the Snapchat account. Id.

On July 7, 2024, Detective Joyner interviewed Randi Lanzafama, a supervisor at the sex offender program of the Virginia Department of Corrections, who had supervisory authority over Tyson when Tyson was listed as a violent sex offender there. June 17 Tr. at 62:9-63:15. Lanzafama told Joyner that other sex

offenders had reported to her that Tyson "had a boy living with him" and was taking minor boys on trips and driving them to and from school. Id. at 60:12-21; 63:16-22; 64:25-65:16.

Based on the interview with Lanzafama, the interview with MF, and taking into consideration that Tyson had not reported any Snapchat or other social media accounts, Detective Joyner obtained search warrants on August 17, 2023, for Snapchat's records and for Tyson's home. June 17 Tr. at 71:4-8; 72:17-19. The first search warrant addressed to Snapchat sought the contents of Tyson's and MF's Snapchat accounts, and was signed by a Powhatan County General District Court Judge.[4] ECF No. 73-2. The second search warrant for Tyson's home was signed by the same Judge, but it was not executed because the warrant contained an erroneous home address for Tyson. June 17 tr. at 74:5-16. A few days later, on August 22, 2023, Detective Joyner obtained another search warrant for Tyson's home, with the correct address, using the same supporting affidavit as the warrant that had been abandoned because it listed the wrong address for Tyson. See generally ECF 73-3; June 17 Tr. at 84:1-6. The corrected warrant was signed by a state magistrate. Id.

Both the search warrant addressed to Snapchat and the search warrant for Tyson's home read: "This SEARCH WARRANT is issued in

---

[4] Tyson has lodged no objection to the search warrant addressed to Snapchat, and it is not at issue in the Second Renewed Motion.

relation to an offense substantially described as follows: § 18.2-472.1. Failure to provide registration information as required." ECF Nos. 73-2; 73-3 (emphasis added). In other words, on the face of the warrants, the only crime being investigated, and for which the warrants sought evidence was the failure to register the Snapchat account by Tyson as a registered sex offender.

**b. The State Search Warrant for Tyson's Home: Supporting Documents**

On the search warrant for Tyson's home, the description of places and items to be searched and the affidavit setting forth probable cause were attached, respectively, as "Attachment A" and "Attachment B." ECF No. 73-3 at 5-9; ECF No. 73-3 at 10-12.

Attachment A contains five headers: "Computers and Electronic Media," "Computer and Internet Records," "Materials Relating to Child Erotica and Depictions of Minors," "Photographs of Search," and "Physical and Forensic Examination of the Seized Items." ECF No. 73-3 at 5-9. The following sections, and their descriptions, are significant to the disposition of the Second Renewed Motion, so they warrant detailed attention.

"Computers and Electronic Media" is the widest encompassing section of the search warrant, describing present and deleted data on all computers, computer equipment, cell phones, tablets, external hard drives, floppy disks, peripheral devices such as keyboards and printers, recording equipment, software, codes, data

8

and data fragments, documentation of the above, passwords, slides, microfilms, CD-ROMSs, etc.--basically any computer and electronics hardware and software whatsoever. Id. ¶¶ 1-8.

The "Computer and Internet Records" section included internet and telephone records, address and identifying information records, and records of all chat apps to include stored pictures, messages, and documents. Id. ¶¶ 9-12.

The "Materials Relating to Child Erotica and Depictions of Minors" section covered any and all visual depictions of minors, names, books, and records of minors visually depicted in sexually explicit conduct (as defined in Va. Code § 18.2-374.1, one of Virginia's child pornography statutes), all records reflecting personal contact "and any other activities" with minors visually depicted in sexually explicit conduct as defined in § 18.2-374.1, and any and all child erotica. Id. ¶¶ 13-16.

At the June 17, 2024 hearing, Detective Joyner testified that he consulted with the Deputy Commonwealth's Attorney for Powhatan County about the search warrant for Tyson's home, and that the prosecutor had advised him that the "Materials Relating to Child Erotica and Depictions of Minors" section should be removed from the description of items to be seized because the alleged probable cause was likely insufficient. June 17 Tr. at 82:8-83:23. Detective Joyner testified that he forgot to remove that section, but that,

9

at the time of the execution of the residential search warrant, he believed that it had been deleted. Id.

The "Photographs of Search" and "Physical and Forensic Examination of the Seized Items" sections set forth that photographs would be taken on-site, and any seized items would be forensically analyzed. ECF No. 73-3 ¶¶ 17-18. That section of the application for the warrant specifically states that the forensic examination of seized items would be to look for "contraband, evidence, and instrumentalities that relate to or constitute violations of [Va. Code §§] 18.2-374.1:1 and 18:2-374.1 . . . ," Virginia's child pornography statutes. Id. ¶ 18 (emphasis added).

### c. Executing the State Search Warrant for Tyson's Home and the Continuing Investigation

The search warrant for Tyson's home was executed by Powhatan and Goochland law enforcement officers on August 24, 2023. June 17 Tr. at 89:21-22. When that process began, Tyson was escorted out of his home and was notified that the law enforcement officials had a search warrant for the premises. June 17 Tr. at 90:10-16. Tyson was taken to a nearby police vehicle where he was questioned by Detective Joyner. Tyson was in the front passenger seat; Detective Joyner was in the driver's seat; and Detective Schwartz was in the back seat. June 17 Tr. at 90:17-19; September 19 Tr. at 35:2-5. Tyson was not handcuffed during questioning. Id. at 24:13-14. No law enforcement agent provided a copy of the search warrant

10

and the affidavit to Tyson as required by Va. Code § 19.2-56(B). June 17 Tr. at 94:10-14; June 11 Tr. at 9:18-11:15.

However, Joyner read Tyson his Miranda rights, and Tyson waived his right to counsel and agreed to answer questions. June 17 Tr. at 184:24-185:1. During the interview, Tyson confirmed that he was a sex offender and that he was required to register his online accounts. Id. at 96:8-25. He reported that he had phones in the house, but no other computers. August 24, 2023, Interview of Richard S. Tyson (ECF No. 97-2) ("August 24 Tr.") Tr. at 3:2-11. Tyson confirmed that he had a Snapchat account but claimed that he was not required to register it because it was not "social media." June 17 Tr. at 98:24-99:3. He also admitted to having a Facebook Messenger account, June 17 Tr. at 98:4-17, and a Discord account, which is an online messaging and chat platform centered around video games. June 17 Tr. at 98:18-21.

Throughout the interview, Tyson claimed that he was compliant with the sex offender registry requirements and that he was not hiding his Snapchat application from the detectives. Joyner asked Tyson whether he had to register his phone passcodes with the State Police, and Tyson stated that he did not, but that "I can give [the phone passcode] to you. It doesn't matter to me." August 24 Tr. at 22:16-20. Tyson also offered to "bring [his Snapchat app] up on the phone and show it to [the officers]." Id. at 25:4-6, 26:9-10 (referencing Discord, "If it's on the phone, you can look

at _it_."); 27:12-13 (referencing Discord, "again, ill [sic] bring
_it_ up. I'll show _it_ to you."); 33:13. (emphasis added to the word
"_it_".) Tyson then again confirmed the passcode to Joyner. _Id._ at
35:14-16. In other words, Tyson voluntarily consented to opening
the telephone to secure access to the Snapchat account.

Shortly thereafter, officers executing the search warrant
found a different phone than the "everyday" phone to which Tyson
had given the detectives the passcode. August 24 Tr. at 43:3-7.
Tyson declined to give the passcode for that phone because "there's
personal stuff on there that you can . . . misconstrue." _Id._ at
44:1-5; _see generally_ 43:12-45:25. But, as to the "everyday" phone,
Tyson continued to maintain that "there's no social media things.
If that's what you're really looking for, then … can I show _it_ to
you myself [and] open _it_ and show _it_ to you myself right here."
_Id._ at 44:8-11 (emphasis added). Tyson also told the detectives to
"take [the phone] back to your place and look at it" because "_if
the warrant_ says that you're _looking for_ something to find -- find
_social media sites_, you're not going to find any." _Id._ at 47:11-
14 (emphasis added); _see also_ 7:8-10 ("No, there's nothing I
haven't registered."), 19:1-3 ("You'll see that there's no --
there's no apps or anything that will open up in my name _under any
social media site_ on any of my phones."); 70:8-9 (emphasis added)
("I mean, when you get into that phone, you'll see."); 74:10-12

("I don't believe that anything else you're going to see is going to be - is going to warrant an arrest.").

Thus, the undisputed record shows that, on several occasions, Tyson stated he did not object to the detectives accessing his "everyday" phone to find the Snapchat application and other social media sites. Detective Schwartz outlined to Tyson how detectives perform a "preview" of evidence on site to determine evidentiary value, to which Tyson responded "Well, my main phone, I have no problem with you going through that and looking at it, make sure I don't have any other social media sites." August 24 Tr. at 48:4-6. "In my main phone, I just gave you the passcode for it, you obviously probably already opened it, you see that I don't have anything but what I've told you." Id. at 46:5-8.

In response to Detective Schwartz, Tyson re-confirmed that he was allowing access into the "everyday" phone. Id. at 74:19-25 ("Respectfully, you have two phones. You're, like, yeah, you can get into that phone. You can look all you want. MR. TYSON: Right. But you understand -- DETECTIVE SCHWARTZ: And then that phone, oh, no, I'm not giving you the passcode. MR. TYSON: Right.").

During the August 24, 2023 search warrant, five phones were seized from Tyson's home. June 17 Tr. at 95:1-11. Later, Tyson's roommate turned over a sixth phone of Tyson's to law enforcement. Id. at 95:12-17.

13

On August 24, 2023, the same day that the state warrant was executed, Detective Joyner interviewed Belynda Payne, one of Tyson's former coworkers, who was present at the scene of the search warrant. June 17 Tr. at 92:7-9. Payne reported that Tyson has been spending a lot of time with MV1. Id. at 92:12-94:5. Payne further reported that Tyson also had been spending time with another minor victim, Minor Victim Two ("MV2"), and that Tyson had even showed Payne pictures of him with MV1 and MV2 on a trip to Virginia Beach. Id.

Detective Schwartz took phones seized during the search warrant back to the Powhatan Sheriff's Office and conducted a preview of the "everyday" cell phone. September 19 Tr. at 56:14-25; 60:25-61:2. While reviewing the "gallery app"[5] of the everyday cell phone, he found child pornography. Id. at 56:24-57:6; 58:5-7. After Detective Joyner returned to the office, Detective Schwartz told him about the child pornography on Tyson's everyday cell phone and showed him a picture of a teenage boy, naked in a bathtub and displaying his genitals. Id. at 15:6-14; 16:3-6. The detectives were later able to identify that teenage boy as MV2. Id.

Because the completion of the interview with Payne at the scene of the search warrant was done before Detective Schwartz

---

[5] The "gallery app" contains the photographs on Tyson's phone.

confirmed the presence of the child pornography to Detective Joyner (upon his return to the office), Detective Joyner was already aware of Tyson's relationship with MV2 before he received the confirmation from Detective Schwartz. September 19 Tr. at 15:6-14. Detective Joyner also testified that Tyson's relationship with MV1 had been on his radar long before the execution of the warrant because Joyner's investigation into MF's Snapchat conversations with Tyson dated back several months. June 17 Tr. at 9:19-10:3; 39:14-41:15.

Detective Joyner also testified that, before any child pornography was discovered on the everyday cell phone, he knew the names of MV1 and MV2 from Belynda Payne, knew that Tyson had taken them on multiple trips, knew that MV1 had a room at Tyson's home and was regularly staying overnight there, and knew that Tyson "was picking up young boys from school in Powhatan, and also taking boys to Kings Dominion." Id. at 63:16-22. Detective Joyner reports that he had planned to talk to MV1 and his family before the execution of the search warrant, but that he had delayed doing so to avoid tipping off Tyson. Id. at 108:21-109:1.

On August 25, 2023, the day after the search warrant was executed and the "everyday" phone was examined by Detective Schwartz, Joyner met with MV1's mother to set up a forensic interview of MV1, which took place on September 6, 2023. June 17 Tr. at 109:2-8; 110:5-7; 113:6-13. During the meeting with MV1's

mother, Joyner asked about MV2. Id. MV1's mother provided Joyner
with the phone number of MV2's father. Id. at 109:9-22. Joyner
then began attempting to contact MV2's father. Id. He ultimately
met with MV2's father on August 29, 2023 to set up a forensic
interview with MV2, which occurred on September 5, 2023. Id. at
117:1-22. In their forensic interviews, both minor victims
reported that Tyson took nude photos of them with his phone. Id.
at 113:14-24 (MV1); Id. at 119:7-20 (MV2). Moreover, MV2, in a
second interview, reported that, at Tyson's insistence, Tyson and
MV2 engaged in oral and anal sex. Id. at 123:12-129:8.

Starting on August 25, 2023 and continuing until August 29,
2023, Virginia State Police ran a Cellebrite report on all the
phones seized during the execution of the search warrant. ECF 73-
4, at 1-8. Initial scans of the phones produced a preliminary
Cellebrite report, which Detective Joyner first reviewed on August
27, 2023. June 17 Tr. at 134:18-21. The report showed that Tyson
had been communicating with MF, MV1, MV2, and several other minors.
Id. at 144:24-145:12. In the Cellebrite report, Detective Joyner
saw the complete image file of a thumbnail image that he had
previously seen in the chat between Tyson and MF in which Tyson
sent her a picture of him holding a fish on his boat. Id. at 35:22-
36:11; 144:13-23. Detective Joyner also "noticed what appeared to
be child pornography" to wit: nude pictures of both MV1 and MV2,
and what was later determined (from MV2 himself during his forensic

interview) to be videos of sex acts between Tyson and MV2. Id. at 153:15-16; 154:17-156:3. Id. at 85:20-86:18.

Tyson was arrested on August 24, 2023, the same day that the search warrant was executed at his home. June 17 Tr. at 89:22. The arrest was pursuant to an arrest warrant sworn by Detective Joyner on August 22, 2024, for violating Va. Code § 18.2-472.1, failure to register a "social media" or online messaging account. The probable cause asserted for the arrest warrant was the July 27, 2023 registry form that Tyson had filled out that did not disclose the Snapchat account that Joyner had observed Tyson using to message with MF and others. June 17 Tr. at 89:6-89:22. So, when Tyson was in custody after August 24, 2023, he was in custody pursuant to that previously-obtained arrest warrant.

### d. The Federal Search Warrant

Because the state law enforcement officers executing the search warrant on August 24 had failed to comply with the Virginia statute that required delivery of the search warrant to Tyson upon its execution, the state investigators reached out to special agents at the Federal Bureau of Investigation ("FBI") to determine whether the federal authorities were interested in the case. June 17 Tr. at 146:13-147:1. Detective Joyner sent his case file to the FBI on September 28, 2023. Id. The case file did not include any Cellebrite reports or any pornographic images from Tyson's phones. Those were only obtained by the FBI after the FBI had completed

its own federal search warrant. Id. at 167:8-17; June 24 Tr. at 37:15-20; 40:1-4.

On November 17, 2023, FBI Special Agent William Lopez applied for and obtained a federal search warrant for the six phones that were then in the custody of the Powhatan County Sheriff's Office. June 24 Tr. at 16:25-17:3; ECF No. 73-6. In the AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE, ECF No. 73-6 at 2 ("Lopez Affidavit"), Special Agent Lopez set forth the crimes being investigated, the items to be searched, and the probable cause justifying those searches.

First, the Lopez Affidavit states that the warrant would seek evidence and instrumentalities of violating: 18 U.S.C. § 2251(a), Production of Child Pornography; 18 U.S.C. § 2252A(a)(2), Distribution or Receipt of Child Pornography; and 18 U.S.C. § 2422(b), Attempted Coercion and Enticement of a Minor. Lopez Affidavit ¶¶ 4-8. Second, the Lopez Affidavit specifically identifies the six phones taken from Tyson's home as the items to be searched. Id. ¶ 3. Third, the Lopez affidavit sets forth probable cause. Lopez avers three bases of probable cause: (1) that, during the interview on August 24, 2023 which took place while the state search warrant for Tyson's home was being executed, Tyson admitted to communicating with several minors via social media, and to having a personal relationship with multiple minor

males, Id. ¶ 15; (2) that, in a forensic interview with MV1,[6] MV1 reported that Tyson had taken nude photographs of MV1 in exchange for money, and that MV2, in his forensic interview, also reported that Tyson had taken nude photographs of him, id. ¶ 16-17; and (3) that, after Tyson's arrest, in a recorded jail call, Tyson had said:

> I didn't give them [police] the password for the second S10 Plus or the Motorola but I don't think either one of them will be that hard to break into and get stuff off of it and if they can actually take images off of my Gallery I am going to be done. So I probably have 100 counts of child porn because I look at stuff that's underage sometimes, not really bad but like teenagers. It's stupid to keep that shit but who the fuck thought this was going to happen?

Id. ¶ 18. The Lopez Affidavit goes on for several pages describing in detail the complexity of digital evidence and the time requirement for properly analyzing it, necessitating the seizure of the items. Id. ¶¶ 21-27. Magistrate Judge Speight signed the warrant that day, November 17, 2023. ECF No. 73-6 at 1.

When the FBI searched the phones, they found photographs of MV1 and MV2 posing nude and videos of MV2 engaging in sexual acts

---

[6] In the Lopez Affidavit, Special Agent Lopez refers to the person referred to in this memorandum as "MF" as "MV1," and to the minor victims referred to in this memorandum as "MV1" and "MV2" as, respectively, "MV2" and "MV3." So MV1 here refers to the person identified as MV2 in the Lopez Affidavit, and, likewise, MV2 here refers to MV3 there.

with Tyson. June 24 Tr. at 19:8-18. The United States indicted Tyson for the enumerated offenses on March 3, 2024.

## DISCUSSION

Tyson has moved the Court to reconsider its holding on the independent source doctrine in the Memorandum Opinion. MOTION at 1. In the Motion for Reconsideration and its supporting memorandum, Tyson contends that the Court erred in its legal analysis by inappropriately expanding "the parameters of the evidence necessary to evaluate the Independent Source Rule" and "analyz[ing] the Independent Source rule more in the context of an inevitable discovery approach." ECF No. 136 at 1.

### I.   Motion for Reconsideration

#### a. Legal Standard

"[D]espite the nonexistence of a specific rule in the Federal Rules of Criminal Procedure, a district court has the inherent power, and thus jurisdiction, to reconsider interlocutory orders prior to entry of judgment on such orders." United States v. Breit, 754 F.2d 526, 530 (4th Cir. 1985). Because the Federal Rules of Criminal Procedure lack guidance respecting motions for reconsideration, courts have "look[ed] to the rules governing civil cases as a substantive guidepost." United States v. Benjamin, No. CR 3:21-525-MGL-1, 2023 WL 3325268, at *2 (D.S.C. May 9, 2023). The Fourth Circuit has set forth three avenues through which courts

may re-consider interlocutory rulings under Federal Rule of Civil Procedure 54(b), which provides the framework for motions to alter interlocutory order in civil matters. The three avenues are: "(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." U.S. Tobacco Cooperative Inc. v. Big South Wholesale of Virginia, LLC, 899 F.3d 236, 257 (4th Cir. 2018) (internal quotation marks omitted); Carlson v. Bos. Sci. Corp., 856 F.3d 320, 325 (4th Cir. 2017); Benjamin, 2023 WL 3325268 at *2 (applying this standard to a motion for reconsideration made in a criminal case).

### b. Analysis

The first avenue that opens the door for reconsideration is whether further litigation has yielded "substantially different evidence" from what evidence was available to the litigants at the time of the original decision. Carlson, 856 F.3d at 325. No new evidence has been adduced in this case since the Court made its ruling on the independent source doctrine in the Memorandum Opinion on January 13, 2025. This avenue is, thus, foreclosed.

The next avenue is whether there has been a change in the applicable law. Carlson, 856 F.3d at 325. Tyson does not cite any cases that have been decided since the Memorandum Opinion was entered on January 13, 2025. In fact, Tyson relies almost exclusively upon the decisions in United States v. Murray, 487

21

U.S. 533 (1988) and United States v. Hill, 776 F.3d 243 (4th Cir. 2015) in arguing that the Court erred in its reasoning on the independent source doctrine. See ECF No. 137. However, both Murray and Hill were cited by both the United States and Tyson in their briefs on the Second Renewed Motion, (ECF No. 102 at 29-30; ECF No. 105 at 34-37). And, both decisions were expressly relied upon in the Memorandum Opinion. See Memorandum Opinion at 51-52, 54-56. Tyson now attempts to re-litigate the decision on the independent source doctrine by splitting inconsequential hairs respecting the application of the Murray and Hill decisions that were already considered and analyzed in the decision sought to be reconsidered.[7] This does not meet the standard for a "change in the applicable law" that would open the doors for reconsideration. Carlson, 856 F.3d at 325.

The final avenue for reconsideration is whether the Court has made a "clear error causing manifest injustice." Id. It appears that this is the gateway to reconsideration on which Tyson relies when he contends that the Court erred in its legal analysis by inappropriately "analyz[ing] the Independent Source rule more in the context of an inevitable discovery approach." ECF No. 136 at 1. For the reasons discussed below, the Memorandum Opinion did not

---

[7] Tyson admits in his reply that one of his arguments "is, admittedly, the essence of the hair splitting maxim[.]" ECF No. 150 at 4.

err in its holding on the independent source doctrine under the standards specified by Murray and Hill, nor did it inappropriately rely on the inevitable discovery approach under the guise of the independent source doctrine.

## II. Independent Source Doctrine

### a. Legal Standard

The legal standard that the Court applied when analyzing the independent source doctrine in the Memorandum Opinion has not changed. A remedy for a violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct. See Mapp v. Ohio, 367 U.S. 643, 648 (1961). Courts may also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." United States v. Oscar-Torres, 507 F.3d 224, 227 (4th Cir. 2007) (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)). Ultimately, "the critical inquiry is whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. (citation and internal quotation marks omitted). The Fourth Circuit requires Tyson to show a strong nexus between the evidence that is sought to be excluded and a real deterrent effect on the behavior of law officers:

> "[I]t is not enough to show that unlawfully seized information 'gives an impetus or direction toward what is to be focused on by the government.' Rather, the nexus must be so direct that the application of the exclusionary rule would have a real deterrent effect on the behavior of law enforcement officers, for '[a]s with any remedial device, the application of the rule [should be] restricted to those [situations] where its remedial objectives are thought most efficaciously served.'"

United States v. Hoang Anh Thi Duong, 156 F. Supp. 2d 564, 576 (E.D. Va. 2001) (citing United States v. Calandra, 414 U.S. 338, 348 (1974).

However, where there is an independent and legal source for challenged evidence, the evidence should not be excluded. The Supreme Court has instructed that: "[Its] development of the exclusionary rule, in the first quarter of [the twentieth] century, [the Court] also announced what has come to be known as the 'independent source' doctrine." United States v. Murray, 487 U.S. 533, 537 (1988); see Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920). The independent source doctrine provides that, "[w]hen the challenged evidence has an independent source" from an illegal warrant, "exclusion of such evidence" is not appropriate. Murray, 487 U.S. at 537; Nix v. Williams, 467 U.S. 431, 443 (1984). "Thus, under the 'independent source' doctrine, when the police discover a particular fact by illegal means but later acquire knowledge of that same fact by independent,

legitimate means, evidence of that fact is not excludable as fruit of the police misconduct." United States v. Mowatt, 513 F.3d 395, 404 (4th Cir. 2008), abrogated on other grounds, Kentucky v. King, 563 U.S. 452 (2011).

"This doctrine applies when a 'search pursuant to [a] warrant was in fact a genuinely independent source of the information and tangible evidence' that would otherwise be subject to exclusion because they were found during an earlier unlawful search." United States v. Hill, 776 F.3d 243, 251 (4th Cir. 2015) (quoting Murray, 487 U.S. at 542). "To find the search with a warrant 'genuinely independent,' the unlawful search must not have affected (1) the officer's 'decision to seek the warrant' or (2) the magistrate judge's 'decision to issue [it].'" Id. (quoting Murray, 487 U.S. at 542).

### b. Analysis

In the Memorandum Opinion, the Court found three separate independent bases for the federal search warrant: (1) Tyson's interview with Detective Joyner and Schwartz on August 24, 2023; (2) the forensic interviews of Minor Victim 1 and Minor Victim 2; and (3) Tyson's jailhouse call. Memorandum Opinion at 53-55. The Motion for Reconsideration attempts to rebut each one. Each will be taken in turn.

First, Tyson argues that the statements that he made to Detective Joyner and Detective Schwartz during the execution of

the state search warrant do not support factually support the federal search warrant's supporting affidavit. Tyson focuses on paragraphs 13-15 of that affidavit, which provided:

> 13. On August 24, 2023, law enforcement officers executed a search warrant at TYSON's residence located at 4880 West Grey Fox Circle, Gum Spring, Virginia 23065. Five electronic devices were collected during the search and one device was voluntarily turned over after the search was completed, totaling six electronic devices. These six devices are the SUBJECT DEVICES. TYSON lived with one roommate who advised law enforcement at the time of the search of the residence he only had one cellular device and it was not any of the devices collected by law enforcement.
>
> 14. At this time TYSON was charged with failing to register his Snapchat social media account with probation.
>
> 15. During the interview pursuant to the search warrant, TYSON admitted to communicating with several minors on various social media platforms. Additionally, TYSON admitted to having a personal relationship with multiple male minors.

ECF No. 73-6 at 5. However, paragraphs 13-15 are supported both by the record of this case and by the statements that Tyson made during the interview.

Paragraph 15 is factually correct because, in the interview, Tyson admitted to communicating with minors on social media platforms. Aug. 24 Tr. at 27:20-28:2 ("DETECTIVE SCHWARTZ: Okay. Snapchat, who do you communicate with on Snapchat? MR. TYSON: "A few – there's several different people … I have everyone from friends to the kids of friends. So I have a lot of – there are children that I communicate – all boys."); Id. at 33:19-34:6

("DETECTIVE SCHWARTZ: you said there was some – some boys here, and the last ones you told me was Jxxxxxxx and Pxxxxxx. MR. TYSON: I think you have them. Oh, I think – I'm trying to think of people that I haven't – I mean, I have some of Gxxxx's friends have – are on there as well, but they're not – I don't talk to them ever.").

It is also correct that Tyson admitted to having a personal relationship with male minors by having the male minors at his home and by going to their homes. Aug. 24 Tr. at 36:23-37:8 ("DETECTIVE JOYNER: These – the young men that you're talking about, did you ever hang out with them? MR. TYSON: Yes. DETECTIVE JOYNER: Did they ever come out and hang with you here? MR. TYSON: Yes. DETECTIVE JOYNER: Did you go to their house and hang out? MR. TYSON: Yes. DETECTIVE JOYNER: So, they've come here before? MR. TYSON: Yes."). Moreover, during that interview Tyson stated that law enforcement would "find stuff that he could be arrested for immediately because we would say it's child porn." June 17 Tr. at 102:13-19.

Tyson acknowledges, as he must, that the statements he made during the interviewed preceded the finding of any child pornography on his electronic devices on August 24, 2023. Thus, the "doors" to the illegal search had not been opened so no evidence could have yet been tainted. ECF No. 137 at 12. These statements provide an independent source, separate from the later

seized child pornography, upon which the federal search warrant was based.

To avoid that result, Tyson argues that Special Agent Lopez was necessarily using "evidence derived from the illegally seized images as his basis to pursue the federal search warrant" because Goochland continued its investigation into Tyson after obtaining the child pornography. ECF No. 137 at 12. To adopt that reasoning would widen the standard for exclusion such that once the "door" is open to an illegal search, then any evidence obtained later in the same investigation must be excluded as its improper fruits. That is at odds with established precedent. Segura v. United States, 468 U.S. 796, 815 (1984) ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence."); United States v. Gray, 491 F.3d 138, 155 (4th Cir. 2007) (evidence held to be admissible despite an earlier illegal search because it was not the "but-for" cause of that evidence being introduced).

Next, Tyson argues that the forensic interviews with Minor Victim 1 and Minor Victim 2 cannot be an independent source for the federal search warrant because "these forensic interviews were the direct result of Goochland investigation which did not take shape as to MV1 and MV2 until after the images were illegally obtained." ECF No. 137 at 15. In the Memorandum Opinion, the Court recited the following facts as relevant to this argument:

> Joyner knew of MV1 as early as June 2023 because of his
> interview with MF and her grandfather. and from
> reviewing the Snapchat conversations on her phone with
> Tyson and MV1. As early as July 7, 2023, Joyner knew
> that MV1 had a room at Tyson's house from his interview
> with Randi Lanzafama. June 17 Tr. at 60:12-21; 62:9-
> 63:22; 64:25-65:16. By August 24, from his interview
> with Belynda Payne, that 2 023, Joyner knew Tyson had
> taken MV1 and MV2 on a trip to Virginia Beach. June 17
> Tr. at 93:17-25. The search warrant was executed on
> August 24, 2023, too, but Detective Joyner was not
> apprised by Detective Schwartz that an initial review of
> the phone found alleged child pornography until his
> return to the office after the interview 56 : 14-25, 60
> :25- with Belinda Payne. September 19 Tr. at 15:6-14,
> 61:2; June 17 Tr. at 93:5-7.

Memorandum Opinion at 53-54. After reviewing the record, the Court

finds no reason to alter those previously found facts which

established that the statements made by the Minor Victims in their

respective forensic interviews constitute a proper independent

source. Before any child pornography was discovered on Tyson's

cell phone, Detective Joyner knew the names of Minor Victims 1 and

2 from Belynda Payne, that Tyson had taken them on multiple trips,

that Minor Victim 1 had a room at defendant's home and was

regularly staying overnight, and that Tyson "was picking up young

boys from school in Powhatan, and also taking boys to Kings

Dominion." June 17 Tr. at 63:16-22. Detective Joyner further

testified that he already had plans to interview Minor Victim 1

and his family, but delayed scheduling those interviews to avoid

tipping off Tyson that an investigation was occurring. June 17 Tr.

at 108:21-109:1. No evidence rebuts Detective Joyner's testimony.

29

None of this information is tainted by what was on the cell phones because it was all learned before any child pornography was discovered by Detective Schwartz. Tyson argues, once again, to exclude this evidence because it came into being after the illegal search occurred. That contention fails because it does not take into consideration the required causal nexus. Here, the record shows that the child pornography images were not the but-for cause of the forensic interviews. Detective Joyner had already uncovered both Minor Victim 1's and Minor Victim 2's personal connection to Tyson from Belynda Payne (Minor Victim 1 regularly staying overnight and Tyson taking them on trips) and Tyson had already stated to law enforcement officials that they would "find stuff that he could be arrested for immediately because we would say it's child porn." June 17 Tr. at 102:13-19. Viewing the evidence as a whole, Tyson cannot be heard to argue that "but-for" the discovery of the child pornography Detective Joyner would not have taken these forensic interviews. Segura, 468 U.S. at 815 ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence."); see, e.g., United States v. Najjar, 300 F.3d 466, 479 (4th Cir. 2002) (holding that the defendant incorrectly argued the standard is that "the illegally obtained evidence tended significantly to direct the investigation to the evidence in question," and that even if an "original illegal search in some

slight way was a but-for cause of the later searches," a later investigation was sufficient to break that causal link).

Finally, Tyson argues that the substance of the telephone call made from the jail after he was arrested should not be considered as an independent source because the call was a by-product of the illegal search into his cell phones. Tyson states that he "was denied bond [on the failure to register charge] by magistrate, in part, because the [sic] Sergeant Joyner relayed the existence of the images to the magistrate." ECF No. 137 at 16. Tyson's counsel notes that "this assertion has been made by the defendant and counsel is attempting to track down that factual issue." Id. at 16 fn. 1. This argument amounts to sheer speculation. There is no evidence in the record that the magistrate judge was made aware of the existence of the child pornography when Tyson was denied bond. And, the timeline created by the record, in fact, suggests otherwise. Detective Joyner testified that after he completed the interview with Tyson on August 24, 2023, he completed an interview with Belynda Payne at the scene of the search warrant. Sept. 19 Tr. at 11:4-13:6. After that interview was completed, he went to his Powhatan office and was first informed about the presence of the child pornography on Tyson's phone. Id. There is no evidence that Detective Joyner was at the detention hearing. Nor is there any inference that he could have reported the presence of the child pornography while in Goochland

31

because he only learned it himself upon returning to Powhatan. The Court would have to engage in improper speculation to accept Tyson's argument that his denial of bond was based on anything other than the failure to register offense. Thus, there is no causal link between the images that were found on Tyson's phone and his later statements made while on a recorded jail line.

Tyson, again, tries the argument that the evidence of this call must be thrown out because it occurred after the illegal search into his cellphones. As discussed above, see supra pp. 28-30, that is not how the independent source doctrine operates.

Altogether, the Court finds that each of the three predicates for the application of the independent source doctrine continue to stand on firm ground. Thus, no "clear error causing manifest injustice" has occurred in the Memorandum Opinion.[8]

## CONCLUSION

For the reasons set forth above, the Motion to Reconsider (ECF No. 136) will be DENIED.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  April 23 , 2025

---

[8] Based on the foregoing reasons showing why the independent source doctrine is applicable based on the facts of this case, it is not necessary to address the arguments the Defendant presents on the inevitable discovery approach.

32